RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0381P (6th Cir.)
File Name: 03a0381p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

WILLIAM H. SMITH,
  *Petitioner-Appellant,*

  *v.*

No. 00-4030

BETTY MITCHELL, Warden,
  *Respondent-Appellee.*

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 95-00320—S. Arthur Spiegel, Senior District Judge.

Argued: September 18, 2002

Decided and Filed: October 28, 2003

Before: SUHRHEINRICH, BATCHELDER, and COLE,
Circuit Judges.

---

## COUNSEL

**ARGUED:** Laurence E. Komp, Baldwin, Missouri, for Appellant. Henry G. Appel, ATTORNEY GENERAL'S OFFICE OF OHIO, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellee. **ON BRIEF:** Laurence E. Komp, Baldwin, Missouri, H. Louis Sirkin, Laura A. Abrams, Jennifer M. Kinsley, SIRKIN, PINALES, MEZIBOV &

---

SCHWARTZ, Cincinnati, Ohio, for Appellant. Henry G. Appel, Charles L. Wille, ATTORNEY GENERAL'S OFFICE OF OHIO, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellee.

SUHRHEINRICH, J., delivered the opinion of the court, in which BATCHELDER, J., joined. COLE, J. (pp. 62-68), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

SUHRHEINRICH, Circuit Judge. In April 1988, a unanimous three-judge panel of the Court of Common Pleas, Hamilton County, sentenced William H. Smith ("Smith" or "Petitioner") to death for the aggravated murder of Mary Bradford. The Ohio state courts denied all of Smith's claims for relief, as did the federal district court on habeas. Smith now appeals from the judgment of the district court denying his application for writ of habeas corpus under 28 U.S.C. § 2254, challenging both his conviction and sentence. The principal issue on appeal is whether trial counsel were ineffective for failing to present mitigating evidence at sentencing. For the following reasons, we **AFFIRM** the judgment of the district court.

### I. Background

#### A. Facts

The following facts are taken from the Ohio Supreme Court's opinion on direct appeal.

On Saturday afternoon, September 26, 1987, Mary Virginia Bradford, age forty-seven, visited the Race Inn, a neighborhood bar in Cincinnati, Ohio. While at the Race Inn, she had several beers and met, talked, and

danced with William H. Smith, appellant, a regular bar patron. She left the Race Inn around 11:45 p.m.

Around 4:00 p.m., on September 27, Marvin Rhodes, Bradford's boyfriend, stopped by her apartment because he had not seen her since Friday, September 25. No one answered the doorbell, but Rhodes saw blood near the front door and found Bradford in the bedroom. Feeling her face, he found no life in her body and called the police.

Responding police officers found Bradford lying stabbed to death on her bed, nude from the waist down. On the floor, near her bed, police found a woman's pants and panties, bloodstained and turned inside out, and, on the bed, an oxygen machine used by asthmatics. Forensic examination disclosed a .13 blood-alcohol level and revealed sperm in her vagina and on her abdomen.

Near the front door of the apartment, police found a chair, with a pool of blood on it, and, on the floor, blood smears including a bare bloody footprint leading to the bedroom. The apartment was otherwise exceptionally neat and clean, with no signs of disorder, disarray, or a struggle, and police found no murder weapon in the apartment. One color television, one black and white television, and a stack stereo with two speakers were missing from Bradford's apartment.

Dr. Harry J. Bonnell, Chief Deputy Coroner, testified that Bradford died as a result of ten stab wounds to her upper body and consequent loss of blood. She was five feet, three inches tall, weighed one hundred sixteen pounds, and a portion of her lungs was missing, which explained her asthmatic condition. Bonnell numbered the wounds from one to ten for descriptive purposes (but not indicative of the order in which inflicted). The most lethal wounds, causing incapacitation within five minutes, were wound eight, a four-inch wound into

Bradford's right lung and heart, and wound nine, a four-inch wound into the sternum and the heart's right ventricle. Wound seven, a five-inch puncture into the rib and liver, and wounds eight and nine all fractured bony structures. Wound two, four inches in depth, crossed her neck from left to right. Wound ten punctured the liver and was no more than four inches in depth. Two wounds, one and five, showed no signs of hemorrhage and thus were inflicted after death or when the heart was not pumping sufficient blood. Wounds one, three, four, and six were superficial. Bradford's body exhibited no other evidence of injury or trauma such as bruises or defense wounds that would indicate a violent struggle. All the wounds could have been inflicted by the same, single edged knife.

On September 28, 1987 homicide detectives went to where Smith lived, the home of Bertha Reid, Smith's mother, which was about four blocks from Bradford's house. When police arrived, Smith was not at home, and Reid let the officers in. While at Reid's home, police noticed a television set matching the description of one of the two sets missing from Bradford's home. Thereafter, police secured a warrant, found the missing two televisions in Reid's home, and seized them.

Reid testified that when her son came home around 2:00 a.m. on September 27, he did not act unusual, nor did he appear to be drunk, high, or upset. However, Smith did carry into Reid's home the two television sets in question along with a large stereo system and two speakers. Reid asked where he got the televisions and stereo, and Smith replied that his girlfriend Carolyn gave them to him. Reid did not accept her son's explanation, telling him he would "have to explain to me a little more about what's going on." Later that morning, Smith and his cousin, Greg took the stereo and two speakers away but left the televisions.

Reid also showed police clothing that her son had worn and September 26 and 27, which police seized. Subsequent forensic analysis revealed that Smith's shirt and shoes bore traces of human blood.

On September 28, 1987, police apprehended and took Smith to police headquarters for questioning. After being advised of his rights, Smith agreed to talk to police. Smith initially asserted that he had driven Bradford home that night but had just dropped her off. He later admitted that he had been in her apartment but had left when her boyfriend arrived.

Smith told police that he met Bradford at the Race Inn, later drove her and her girlfriend to another bar, and then drove Bradford home. While at her house, Smith claimed that someone he thought to be Bradford's boyfriend arrived, and Smith decided to leave quickly. After Smith left, he realized that he had left a packet of cocaine, worth $2,500, at Bradford's house. After he returned, Bradford's boyfriend and the cocaine were both gone. Smith then talked with Bradford.

" * * * [W]e talked about restitution, you know. She said she'd give me some of that body. I said okay, it's good enough for me, you know, but then after I got that [had sex with her] it wasn't good enough, you know, so I asked her like you got any money and stuff, you know. She said she ain't have no money. So we start arguing and next thing you know she slid over to the kitchen and got [a] little blade--[small carving knife]."

According to Smith, Bradford was stabbed in the stomach during the ensuing struggle and fell onto a chair. He removed the knife from her stomach, and she dragged or walked by herself to the bedroom. He recalled stabbing her in the neck in the bedroom after she called him a motherfucker, but he did not admit inflicting the other stab wounds. When she was lying on the bed, he

took her clothes off and got back on top of her and had sex again. Police asked:

"Q. * * * [A]fter you had sex with her the second time, after she was stabbed, then what'd you do?

"A. I gathered up my things together and started taking her stuff downstairs.

"Q. What'd you take out of there?

"A. Her two TVs and her stereo."

Smith said he made four trips carrying her things down to his car and that he took her things in order to sell them. Although Smith initially claimed that he did not know whether Bradford had stopped breathing, he later admitted he decided to have sex with her again because "she was still breathing then." He said that he pulled his penis out as he started to climax and finished ejaculating on her stomach. He did this because he was thinking about getting out of the apartment. Smith claimed he threw the knife into the Ohio River and sold Bradford's stereo in Dayton. However, police recovered her stereo in Cincinnati. When police interviewed Smith, they also seized a pair of undershorts from him stained with blood of the same type as Bradford's.

*State v. Smith*, 574 N.E.2d 510, 512-14 (Ohio 1991).

**B. Trial Proceedings**

Smith was indicted on October 21, 1987, on two counts of aggravated murder, pursuant to Ohio Rev. Code § 2903.01(B) (Counts I & II), and one count of rape (Count III), and one count of aggravated robbery (Count IV). Counts I and II each contained two death penalty specifications, one alleging aggravated murder during rape and the other alleging murder during aggravated robbery. Smith initially entered a plea of

not guilty by reason of insanity as to all charges.[1] As a result, the trial court ordered that Smith be evaluated with respect to his mental state at the time of the alleged offense. Smith was evaluated by three experts, Nancy Schmidtgoessling, Ph.D, a clinical psychologist of the Court Psychiatric Center, Roger H. Fisher, Ph.D, a clinical psychologist, and Glenn Weaver, M.D., a psychiatrist. Dr. Schmidtgoessling evaluated Smith on November 27, 1987, and on December 12, 1987. On December 14, 1987, Dr. Schmidtgoessling filed a report with the court, in which she concluded that Smith currently showed no sign of major psychological disorder and that he was sane at the time of the alleged offense.[2]

---

[1]Smith was represented by attorneys Dale G. Schmidt and Robert J. Ranz during his trial proceedings.

[2]Dr. Schmidtgoessling prepared her "Not Guilty by Reason of Insanity Report" ("NGRI") in December 1987, four months prior to the mitigation phase. In it she indicated that several members of Smith's family were interviewed, and that she reviewed the following records:

Available for review were a social history and psychological evaluation performed by the Hamilton County Department of Human Services in 1965; a statement of juvenile arrests provided by the Hamilton County Juvenile Court; school records from Cincinnati Public Schools; and one prior evaluation by the Court Psychiatric Center completed in 1976. Records were requested from Longview State Hospital for Mr. Smith's stay there during his childhood years but we were informed that those records were destroyed in 1981. Lastly, records were requested, but never received, from the Adult Parole Authority.

Based on her review of those records, Dr. Schmidtgoessling reported Smith's family and social history as follows:

By way of background, Mr. Smith is the product of an unhappy, rather bizarre family. He had little contact with his biological father, until Mr. Smith was about twelve years old, only becoming close when Mr. Smith was about nineteen. There was a stepfather present, who had been hospitalized for psychiatric problems and incarcerated for Rape. It is unclear at this time what impact these men had on Mr. Smith during these early years. The mother, according to records and collateral reports, has a history of mental illness and was hospitalized at times, bearing a diagnosis of "simple schizophrenia." She was abusive and bizarre in her behavior toward the children, for example, hiding food from them and beating them unpredictably. Mr. Smith has five siblings; two of these are known to have had legal contact besides the defendant. In summary, the family of origin was a rather chaotic, unpredictable environment for the defendant.

Mr. Smith was placed in foster homes and at Longview State Hospital for a number of years during his developmental period. The Juvenile Court records indicate that Mr. Smith was placed at Longview State Hospital as a dependent child, although there are some indications of behavior problems preceding that placement, including firesetting and incorrigibility. He apparently remained there from February, 1996 to August, 1971 with a diagnosis of emotionally unstable personality and borderline intellectual functioning. Mr. Smith does not seem particularly unhappy about many of his experiences at Longview, describing playing basketball and watching TV. Also, it seems that the adults in his environment were nicer to him there than in any other environment where he had lived. He describes having been prescribed antipsychotic medications and having been given shock treatment while at Longview.

In his juvenile years, Mr. Smith had several court contacts. Usually, these were property crimes such as Burglary, Robbery, and Unauthorized Use of a Motor Vehicle although he also had a couple of charges reflecting unruliness.

Academically, Mr. Smith has advanced to approximately the tenth grade.

. . . .

In terms of substance abuse, Mr. Smith reports beginning to experiment with wine when he was only about fifteen years old. . . . He believes he has been drinking daily since around age seventeen, averaging a case of beer per day. He does drink in the morning. He reports he has had some blackouts and it appears that he has an increased tolerance with his extensive use. Mr. Smith recalls beginning to use marijuana when he was about

eleven years old, having been given a joint by a friend's mother. It seems that he uses marijuana on a fairly regular basis. He began using cocaine a couple of years ago. He reports using this approximately every other day during this time period . . . .

Psychological testing was administered as part of the current evaluation. On the Wechsler Adult Intelligence Scale-Revised, Mr. Smith obtained a Verbal IQ of 78, a Performance IQ of 84, and a Full Scale IQ of 78. These scores place Mr. Smith in the borderline to low average range of functioning. These scores are consistent with an IQ established during his stay at Longview State Hospital between 1966 and 1971. However, records from the Hamilton County Department of Human Services shows an IQ established in December, 1965 using the Stanford Benet [sic]. This score of 101 placed him in the average range of functioning. . . . The psychological evaluation conducted in 1965 by the Welfare Department showed that Mr. Smith was unable to concentrate and organize himself, and thus was unable to sustain his functioning in an unstructured situation. It was felt at that time that his reality contact was precarious. He had such serious feelings of insecurity that he was unable to relate satisfactorily despite his need for human relationships, according to that psychological evaluation. A strong tendency towards depression and attempts to repress hostile impulses were noted at that time. The psychologist felt that Mr. Smith's thinking at times bordered on autistic. When evaluated by the Court Psychiatric Center in 1976, Mr. Smith showed no signs of impaired reality testing. He was felt to relate in an appropriate manner and showed appropriate modulation of his emotions during the interview. He was described at that time as suffering from an adjustment reaction of adolescence and dyssocial behavior.

In conclusion, Mr. Smith currently shows no sign of major psychological disorder. The available records also suggest an absence of substantial psychological disorder such as hallucinations, delusions, gross paranoia, mental retardation, or the like. However, history does suggest that this is a person who has had substantial behavioral problems throughout his life. . . . Personality wise, we would suggest that Mr. Smith has a number of deficits including interpersonal insecurity and sensitivity, impaired empathy, inadequate conscience development despite the ability to verbalize social rules, chronic underlying depression secondary to a history of neglect and abuse, and

In his profile of Smith's psychological status, Dr. Fisher stated that Smith was "fully oriented, rational and alert. . . . There was no evidence whatsoever of any form of mental impairment." Dr. Fisher also stated that "[d]espite his history of hospitalizations, I have no reason to believe this man has ever had an emotional illness. I think instead he has had long-standing characterological problems from early childhood . . . . " Regarding criminal responsibility, Dr. Fisher concluded that "Smith was free of any mental or emotional disease or defect. I feel he had sufficient judgment to have been able to differentiate legal right from wrong and was psychologically sound enough to have been able to refrain from illicit actions if he had chosen to do so." Dr. Fisher added that, by his own description, Smith's behavior "was purposeful and goal-directed. He was provoked to anger by the loss of his cocaine and acted on that anger by trying to make the victim pay him back for what he thought her boyfriend had stolen."

Dr. Weaver performed a psychiatric exam. Dr. Weaver concluded that although Smith had extremely limited impulse controls in past years, he did not possess a mental disease or defect, and that he did know the wrongfulness of his conduct. Smith thereafter withdrew his insanity defense.

Trial counsel made initial contact with Jane Core of the Office of Public Defender ("OPD"), a mitigation specialist, in January 1988. In a letter dated January 21, 1988, Core

strong underlying hostility secondary to life experiences. It seems that in part he attempts to resolve many of his underlying tensions and feelings by using substances. Despite that, he still conveys being a person without significant direction or social attachments.

With respect to the legal question, it is my opinion that Mr. Smith was sane at the time of the alleged offense. He did not suffer any substantial psychological disorder that would have grossly impaired his ability to determine right from wrong or to restrain his behavior.

informed counsel that he would need to request Smith's background records. Core also indicated that she had made arrangements for OPD investigator Maggie Liverani to provide assistance, but that Maggie would not be available until late February. Core stated she planned to meet with counsel on February 26.

In a letter dated February 8, 1988, Core thanked Ranz "for the materials regarding Mr. Smith," especially Dr. Schmidtgoessling's report, "which certainly indicated a lot of possible things to work with." Core told Ranz that he should file a motion asking the court to cover the expenses of Liverani's investigation, since OPD did not have the funds, and that he would "need to make sure the Court has approved funds before she begins her investigation at the end of this month." Finally, Core asked Ranz to forward a list of places he had requested records from as well as copies of those records as he received them.

On February 29, 1988, Core sent a letter to counsel chastising Ranz for not providing the requested materials, which she stated were needed for Liverani to begin her investigation. In that letter Core stated: "Because of these factors I do not feel it is possible to conduct an adequate investigation on behalf of your client . . . and regret to inform you that neither Ms. Liverani or I will be available to provide assistance in this matter."

Counsel responded on March 1, 1988, enclosing copies of letters sent to which no replies had yet been received, and referencing Core's letters of January 21 and February 8, acknowledging receipt of the reports already sent. Ranz also stated that the court had approved payment to Liverani. Ranz stated that Smith was quite difficult to deal with and was counsel's only source of information. Finally, Ranz asked Core to reconsider her position. On March 11, 1988, Core reiterated her refusal to assist. Core apparently changed her mind, however, on March 24, 1988, after being apprised that Smith had waived his right to a jury trial. Nonetheless, on

March 31, 1988, counsel informed Core by letter that they would not be needing Liverani, because they had made other arrangements.

Trial counsel elected instead to request the "friend of the court" appointment of Dr. Schmidtgoessling. *See* Ohio Rev. Code § 2929.03(D)(1). Counsel met with Dr. Schmidtgoessling on March 28, 1988, two weeks prior to the sentencing hearing. Dr. Schmidtgoessling recalled that counsel "could offer no direction to the mitigation," and that counsel seemed unfamiliar with any of the records from the past evaluation of mental competency, juvenile records, or Human Services Department records. Rather, Dr. Schmidtgoessling felt that counsel were more focused on winning at the trial level. She agreed to make a copy of all the records for counsel, and to prepare a mitigation report detailing Smith's past developmental history and describing his current functioning.

Trial began on April 4, 1988. On April 6, 1988, he was convicted in the Court of Common Pleas of Hamilton County, Ohio, by a unanimous three-judge panel of two counts of aggravated murder under Ohio Rev. Code § 2903.01(B) and two death specifications for each count under Ohio Rev. Code § 2929.04(A)(7). He was also convicted of one count of rape under Ohio Rev. Code § 2907.02, and one count of aggravated robbery under Ohio Rev. Code § 2911.01. The sentencing hearing began on April 11, 1988, and concluded on April 14, 1988.

Dr. Schmidtgoessling was officially appointed as a friend of the court on April 6, 1988, following a finding of guilty by the trial court. Dr. Schmidtgoessling also testified that she called Ranz at home on April 10, 1988, because she did not know if she was supposed to testify at the sentencing hearing. According to Dr. Schmidtgoessling, Ranz did not seem to know what role Dr. Schmidtgoessling would play at the hearing. She filed her mitigation report on April 11, 1988, and testified at the mitigation hearing the same day. Given

the short period of time, Dr. Schmidtgoessling relied primarily on the records she received when preparing the NGRI report.

Five witnesses testified at Smith's mitigation hearing. Two of Smith's uncles testified briefly. Each characterized Smith as a nice person. Smith's mother, Bertha Dean Reid, read a prepared statement to the court. In her statement Reid told the court that Smith grew up in various foster homes from the time he was 11 months until ten years old, and that during that time he was abused. She repeatedly stated that she thought Smith was mentally disturbed. She reported that Smith stole from her, and that once, when she punished him for breaking a window, Smith set fire to the kitchen curtains. She later had him probated to Longview State Hospital. In Reid's view, "there is something wrong with William, mentally."

Reverend Timothy McDonald, Smith's former pastor, testified via deposition that Smith sought counseling to try to find a way to deal with his drug and alcohol dependency. On cross-examination, McDonald acknowledged that Smith's wife came for marriage counseling because there was violence in the marriage.

Counsel also read a brief, unsworn statement prepared by Smith:

"Sirs, I have been very truthful in my telling of the facts of what happened.
"I did not go to her apartment for any reason other than to get my stuff, and I was invited.
"We did go to bed together.
"She got the knife, and I don't know what happened to me. It is a big blur, and I guess I sort of went mad.
"I didn't want to hurt her, but what am I to do when faced with something like this?

"I am very sorry for what did happen to her, and I am very sorry she is dead; but it was beyond my control.
"I have asked for help before, and did not get it. So it is too late now.
"But again, I ask for help and the mercy of the court.
"Thank you, members of the panel."

As noted, Dr. Schmidtgoessling also testified, and her mitigation report was admitted into evidence. The doctor indicated that she administered the Wechsler Adult Intelligence Test, and the MMPI. Regarding his family background, Dr. Schmidtgoessling told the sentencing panel that:

This is a man who came from a background, where his family members were incapable of caring for him, particularly his mother, who has a history of mental illness, as well as herself of physically abusing the children.

His biological father, as far as I can determine, is unknown.

There was a stepfather, who actually lived with the family, who was very abusive, intimidating, a very frightening man, according to the reports that we have, and that he grew up largely for a number of years in either foster homes for three or four years--three years, I think in the Longview Children's Unit. So essentially, his background is one that behaviorally is marked by hyper-activity, some learning problems secondary to distractability, poor achievement in school, a lot of behavior problems, stealing, fighting in school.

He was early on described by one psychologist as emotionally disturbed; and after another evaluation by a different psychologist was actually placed in the Children's Unit at Longview, where he in fact did much

better, I think because of the structure there of the school. The note shows that he got along there fairly well.

I think the most important thing from a psychological point about those early developmental years is the lack of structure in the home, the lack of close nurturing by parent figure, or any adult figures, the affect [sic] of . . . physical abuse and emotional abuse in the family.

Dr. Schmidtgoessling noted that she found a history of mental illness in the family; both Smith's mother and Reid, the stepfather, had been hospitalized at Longview. Dr. Schmidtgoessling next described the testing performed on Smith. She noted that he had been tested several times. In 1965, he was found to have an IQ of 101, which is in the average range. At Longview, however, his IQ test showed him to be functioning in the borderline range of intelligence. Dr. Schmidtgoessling characterized this as "a drastic and significant drop," attributable "only to the behavior problems or emotional problems he was experiencing at that time." Her testing of him revealed a verbal IQ in the 70s, and a performance IQ in the low 80s. She described him "as functioning near average in terms of everyday activities." She summarized his intelligence as "low, average to borderline range of intellectual functioning." Schmidtgoessling stated that she did not reach any conclusion on his character based on the MMPI.

Dr. Schmidtgoessling also reported some substance abuse. She stated that, although she had very little information other than Smith's self-report, it appeared that he had a long-standing history of alcohol and marijuana use, and some cocaine use. Dr. Schmidtgoessling indicated that Smith did not have paranoia, but was very sensitive to being exploited. She stated he "ha[d] personality flaws and defects," but that she "d[idn't] think he [was] organically impaired and defective in that way." She added that he "lacks empathy," and "is inclined to do things to other people that the rest of us

find very cold and unacceptable, because of his personality style . . . ."

Dr. Schmidtgoessling reported from a one-page summary from Longview Hospital. The hospital diagnosed Smith as "physically and essentially a normal, black youngster, psychologically," but characterized him as having a "a personality-trait disturbance and an emotional, unstable personality." Dr. Schmidtgoessling stated that this diagnosis coincided with her own, and was consistent with other records at that time. She concluded that Smith "certainly did not impress us as mentally ill in any gross fashion."

On cross-examination, Dr. Schmidtgoessling stated that, despite Smith's developmental background and his mother's history of mental illness, she found no evidence that Smith had ever suffered from a substantial mental illness. In Dr. Schmidtgoessling's view, Smith was capable of appreciating the criminality of his acts. She also stated that Smith never showed any remorse for the victim. Lastly, when asked on cross-examination whether she thought the crime was a conscious choice, or maybe a psychological deficit, she stated:

I certainly think his psychological deficits played into the situation. He told me that he was defending himself against someone who came at him with a knife. In that sense it was a choice. I think that he told me that this woman had agreed to the sexual activities and that he had only had sex with her once, and so that was a choice. But in terms of like his coldness, and stuff, that is part of him. That is the way he always is.

As noted, Dr. Schmidtgoessling's mitigation report was admitted. At the outset, Dr. Schmidtgoessling stated that "[n]umerous sources of information were used in constructing this report." She detailed the following:

Mr. Smith was evaluated by the undersigned, Nancy Schmidtgoessling, Ph.D., Clinical Psychologist, on November 27, 1987 and December 12, 1987 at the Hamilton County Criminal Justice Center, and on April 8, 1988 at the Hamilton County Jail Annex. This included an interview as well as administration of the Wechsler Adult Intelligence Scale–Revised (WAIS-R) and the Minnesota Multiphasic Personality Inventory (MMPI). Also, the defendant was interviewed by Shirley W. Leahy, MSW, ACSW, Clinical Social Worker, on November 9 and 12, 1987 at the Hamilton County Criminal Justice Center. Prior to these interviews, Mr. Smith was made aware of the non-confidential nature of the evaluation and signed an information sheet permitting us to use information gathered from these sessions in a mitigation report. Additionally, Ms. Leahy made collateral contact with the prosecuting attorney, Mark Piepmeier; the investigating officer, Detective Joe Hoffman of the Homicide Squad; Lt. Fletcher of the Homicide Squad, the arresting officer; the defendant's grandmother, Elizabeth Carter; the defendant's aunt, Pam Carter; the defendant's uncle, Gary Carter; and the Hamilton County Criminal Justice Center Psychiatric Unit. Attempts were made to reach the defendant's mother; Mrs. Bertha Smith; Mrs. Smith has no phone number but we attempted to reach her both at a neighbor's and . . . her mother's, although Mrs. Smith never returned our phone calls. Additionally, following Mr. Smith's conviction, this examiner had collateral contact with the defense attorneys, Robert Ranz and Dale Schmidt, and the prosecutors, Mark Piepmeier and Pat Dinkelacker. Records were also available for review including social histories and psychological evaluations performed by the Hamilton County Department of Human Services; some records from Hamilton County Juvenile Court; a one page summary of the defendant's treatment at Longview State Hospital; one prior psychiatric evaluation performed by the Court Psychiatric Center; records from the Ohio Department of

Rehabilitation and Correction; some limited parole and probation records; very limited school records from the Cincinnati Public Schools, a copy of the disposition of Reverend Timothy McDonald; part of the defendant's preliminary hearing; and a copy of the defendant's statement at the Motion to Suppress.

Dr. Schmidtgoessling's report provided further details of Smith's background, particularly in the areas of his developmental history[3], his stay at

---

[3]Dr. Schmidtgoessling summarized Smith's developmental background as follows:

Mr. Smith's developmental background is a rather confused, difficult one. It is unclear exactly who is his biological father, since the mother reportedly had relationships with numerous men. Therefore, the information available does not permit us to appreciate what role if any his biological father may have played in his development. The defendant's mother is known to have had several psychiatric hospitalizations. She was diagnosed as a simple schizophrenic . . . .The records established that the mother was unable to provide either appropriate structure, discipline or nurturance for the children in the family. She is described as both abusive and neglecting towards the children. Even relatives report that Mrs. Smith would beat the children with chains and belts and make them go to bed without dinner. . . .

The man who seemed most active in the family during Mr. Smith's developmental years was a Mr. Ludie Reid. This man was described as having a history of alcoholism, numerous and frequent court contacts and a history of inappropriate sexual behavior. Apparently, the children were severely intimidated by Mr. Reid because of his violent acting out when using alcohol. For example, he was described as having pulled knives on the children and once attempting to choke the defendant's brother. Mr. Reid was also described as having had a history of two known sexual offenses . . . . Further, he is known to have been hospitalized at Longview State Hospital and it seems that that is where he met Mrs. Smith. . . . During the defendant's developmental period, it seems that Mr. Reid was present in the home for a short time when Mr. Smith was approximately eight

years old and then again during Mr. Smith's mid-teen years.

The Smith family was known to public assistance since 1955 and had an active case with Children's Services since October, 1958. In November, 1958, Mrs. Smith was sent to Longview State Hospital for treatment. The defendant at that time was approximately one year old. Also, sometime within his first year of life, Mr. Smith was hospitalized at the Convalescent Ward at Cincinnati General Hospital for a variety of physical symptoms including pneumonia, measles, tonsillitis, a skin condition and a vitamin deficiency. The origin of these disorders is not recorded in available records. When the mother was hospitalized, Mr. Smith and his brother, Norman, were placed in the first of two foster homes. Mr. Smith spent his years one through seven (1958 to 1964) at the home of Mr. and Mrs. Julian Davis. Apparently, Mr. Smith did well there in the first few years of life but around 1962, the foster parents noted some behavior problems both at home and at school . . . . In 1964, while enrolled at South Avondale School, both of the Smith brothers were reported to be creating disturbances in the classrooms, fighting on the playground, and stealing lunches and personal property from other children. Additionally, the brothers were stealing from the foster parents although the foster parents reported (in records) that they gave adequate money to the children. It seems that the boys would often use the money to buy food. In 1964, when the brothers were involved with destroying some neighbor's property and the police were called, the foster parents felt that they could no longer cope with the two brothers and they were transferred to their second foster home. However, records show that the foster mother described the defendant as an affectionate person who related relatively better to adults than to children. . . .

Mr. Smith was then transferred to the home of Mr. and Mrs. Lewis Harrison where he stayed from September, 1964 to March, 1965. Records show, however, that there were problems in that home from the beginning. The brothers were stealing from the foster parents, typically to buy food and toys. The foster parents reported that the boys would laugh in their (the foster parents) faces when disciplined. The foster parents also reported that the boys would visit the maternal grandmother and the mother (who had been released from the psychiatric hospital around 1961) and that following those visits, the boys would be quite upset afterwards. At those times, the foster parents

described that the boys would wet the bed, tear up their clothes, and similar behaviors. At this time, the children were enrolled at Millvale School and complaints of their behavior continued in school.

Mr. Smith was referred to the school psychologist at this point in his history and although he was described as "emotionally disturbed" the psychologist was unable to get sufficient rapport with him to complete the testing and come to a fuller diagnosis. In October, 1964, the defendant was sent to the Twelfth Street Clinic and apparently put on medications to calm his hyperactivity. The defendant was described by their worker at the time as hyperactive yet amiable. That clinic recommended that the children be placed either at a structured psychiatric facility such as Longview State Hospital or at Glenview School. When the second foster home terminated, the boys were placed at Allen House.

In July, 1965, the children were placed with their biological mother and with Mr. Reid despite the earlier recommendation from the psychologist. However, the defendant soon began having school problems and was referred for psychological testing in December, 1965. At that evaluation, he was described as functioning in the average range intellectually but as being very distractible and having a short attention span. The report noted that he was unable to concentrate and organize and that his reality contact was "precarious." The psychologist noted that Mr. Smith was so insecure that he was unable to relate satisfactorily to other people and that he attempted to repress his hostility. It stated that he had a trend toward depression and that his emotional expression was often inappropriate. It was felt that his thinking "sometimes borders on autistic." The thrust of the report was to point out that the extent of Mr. Smith's deprivation and the instability of his home life had prevented the gratification of his basic psychological needs so that his behavior problems were really not surprising. The report recommended that he would function best in a one-on-one situation in school and that he needed a warm, structured living placement. A rural placement was suggested so that he would have no competitive peers but if that were not available, psychiatric hospitalization was suggested.

Longview[4], and his later functioning.[5]

In the mitigation report Dr. Schmidtgoessling also noted that Smith had reported a rather extensive history of alcohol and substance abuse. She also reported that Smith described being in prison twice previously, but that his entire legal history was unknown, because she could not get the court records.

Dr. Schmidtgoessling reported that Smith's current psychological functioning showed him in the low average to borderline range of intellectual functioning. Dr. Schmidtgoessling concluded:

> In summary, Mr. Smith is the product of a rather chaotic family life in which his basic needs for structure,

---

[4]Dr. Schmidtgoessling discussed Smith's stay at Longview:

Soon thereafter, Mr. Smith was placed at the Longview State Hospital. We have been informed by that center that their records from that time period are destroyed. A one page summary of his stay at Longview State Hospital was forwarded to our Center in 1976 when we performed our prior evaluation. Those records described him as suffering borderline intellectual functioning, as having a slight speech impediment, as restless and distractible with poor insight, but having no evidence of psychosis. His hospital course was described as "uneventful" although he was discharged in August, 1971 (after being admitted in February, 1966), on AWOL status. Other records as well as Mr. Smith's self-report and the report of collateral sources, suggest that he was initially placed at Longview because of behavior problems such as "running around, tearing things up and setting a fire."

[5]Dr. Schmidtgoessling reported that there were few records documenting his later functioning. He left home at about fifteen years of age. His educational background was also poorly documented. She noted that his school records had been sent to Longview when he transferred there, and were later destroyed by Longview. The Cincinnati Public Schools provided records from the ninth and tenth grades, showing numerous absences and poor grades.

---

discipline, and nurturance were not met. This is because he [sic] family of origin was incapable of caring for him because of his mother's mental illness and inadequate parenting skills as well as the lack of an effective male model. Other family members were apparently disengaged or unable to overcome the family of origin's deficits. Mr. Smith spent his earliest years in foster homes that seemed to provide the structure and discipline that he needed, but nevertheless were incapable of meeting his extensive needs. He shows an early history of behavior problems (stealing, fighting), bedwetting, hyperactivity and strong dependency needs. As he got older and moved back into the family of origin, he was apparently subjected to abuse, neglect, and intimidation. The parent figures available (Mrs. Smith and Mr. Reid) were inadequate in teaching him appropriate and effective adaptive skills. He moved out of his family of origin some place in his mid to later teens and became apparently highly influenced by "street life." This reinforced his antisocial tendencies, and even further failed to induce a socially appropriate and age appropriate set of adaptive skills (appropriate educational attitude, stable interpersonal relationships, a substance free lifestyle). He apparently became more involved in the use of substances which he initially seemed to use to soothe his feelings of being abandoned and lonely, but which eventually became habitual to him. . . . At the time of the offense for which he was convicted, Mr. Smith reportedly was using alcohol and cocaine on a frequent basis, was involved in no significant relationships, and was working part-time.

This man's long-term psychological functioning is marked by a very high need for dependence which was manifest not only in his excessive interest in food as a youngster but in his ongoing substance abuse as an adult. However, his psychological capacity for intimate relationships is poor largely because he has had no significant intimate relationships himself during the

critical developmental period of the first few years of life. . . . He has never achieved a stable sense of direction, never having experienced this in his earlier years.

There are no indications that this man ever suffered a substantial mental illness such as schizophrenia, manic depression, mental retardation or other psychological disorder that would grossly impair his ability to test reality. He did suffer hyperactivity of unknown origin when younger[.] Now, he does suffer a personality disorder which impairs his ability to think towards and plan for the future, utilize judgment in a socially appropriate and effective manner, relate intimately to others and use guilt and anxiety to inhibit acting out behavior. Lastly, this man does report some symptomatology that may be the effect of chronic cocaine use, specifically some restlessness and hyperactivity.

It is my opinion that Mr. Smith did not suffer from a gross impairment of reality testing or restraint at the time of the offenses for which he as been convicted. It is my opinion that both his personality style and his substance abuse would have impaired his ability to appreciate the situation of the victim and to apply his judgment in a socially appropriate fashion at the time of the offenses for which he was convicted.

### C. Trial Court Weighing

Pursuant to Ohio Rev. Code § 2929.03(D)(3), the trial court weighed the aggravating factors against the mitigating factors.[6] The court noted that by its verdict, the three-judge

---

[6]Under Ohio law, once the prosecution has proven one or more statutory aggravating circumstances beyond a reasonable doubt, the jury or sentencing panel must weigh the aggravating circumstances against the mitigating evidence before imposing a death sentence. Ohio Rev. Code

panel unanimously found Smith guilty of specifications I and II as to Count One and specifications I and II as to Count Two. The court then assessed the mitigating factors. Regarding the nature and circumstances of the offense, the court found that "[t]here is absolutely no question that the defendant purposely, coldly and brutally killed Mary Bradford while committing the offenses of rape and aggravated robbery. He stabbed the victim ten times and then raped her as the life drained from her body. This is not a mitigating factor and certainly does not militate for mercy." As to the character and background of the offender, the court stated:

The history, character, and background of the offender.–As discussed earlier the defendant had a difficult childhood. As a result, he developed personality disorders which adversely affected his ability to relate to

---

Ann. § 2929.04(B) (Anderson 2002). The panel may consider as mitigating evidence:
the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:
(1) Whether the victim of the offense induced or facilitated it;
(2) Whether it is unlikely that the offense would have been committed, but for the fact that offender was under duress, coercion, or strong provocation;
(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law;
(4) The youth of the offender;
(5) If the offender's lack of a significant history of prior criminal convictions and delinquency adjudications;
(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;
(7) Any other factors that are relevant to the issue of whether the defendant should be sentenced to death.
Ohio Rev. Code Ann. §2929.04(B) (Anderson 2002).

others. He is unable to appreciate the needs of others and has little regard for human life. This panel recognizes Smith's personality disorders and difficult childhood as a mitigating factor.

The sentencing panel rejected Smith's argument that the victim provoked him because she came at him with a knife. The court observed that Bradford was a slight woman who suffered from a lung ailment that required her to keep a breathing device. The sentencing panel also found no evidence of duress, coercion or strong provocation. The court found that even if the cocaine was stolen, this was not "strong provocation." As for the third mitigating factor under § 2929.04(B), the trial court held that Smith did not suffer from a mental disease or defect at the time of the crime, and specifically noted that Smith did not claim insanity at trial.

Smith's youth was not a factor, nor his lack of significant history of criminal convictions. Further, since he was the principal and only offender, his degree of participation in the crime was not a mitigating factor. Finally, as to the catchall factors, the sentencing panel noted that although Smith claimed to be drunk and high on the night of the offense, there was no evidence presented to indicate that Smith was not in complete control of his faculties at the time.

In weighing the mitigating factors against the aggravating factors, the sentencing panel concluded:

A careful and meticulous review of the mitigating factors discloses that the defendant had a difficult childhood. He had no real family to take care of him–nurture him. There is a history of mental illness in his family. As a result, Smith grew up with a personality disorder that affected his ability to form personal relationships or to appreciate the needs and feelings of others. He became cold and unfeeling with a lack of regard for human life. He developed a specific discomfort and anger toward women.

It is the opinion of this three-judge panel that the mitigating factors present pale before the fact that the defendant's actions were plotted, vicious, persistent and utterly callous. Mary Bradford was not stabbed once but ten times. She then had to suffer the final indignities of being raped by Smith while she lay dying and then having her property stolen. It is clear that the defendant went to her apartment to obtain "restitution". He obtained it in a violent and ruthless manner, with absolutely no regard for the life of Mary Bradford. We find no conduct or provocation on the part of Mary Bradford which would warrant the defendant's lethal response.

The panel unanimously concluded that the aggravating circumstances outweighed all the mitigating factors Smith advanced, and imposed the death penalty on each murder count. The panel also sentenced Smith to a minimum term of ten years and a maximum term of twenty-five years, with ten years actual incarceration to run consecutively, as to Count III (rape) and Count IV (aggravated robbery).

**D. Direct Appeals**

As required by statute, *see* Ohio Rev. Code Ann. § 2929.05, the Ohio Court of Appeals and Ohio Supreme Court conducted an independent weighing analysis. Both concluded that the aggravating factors outweighed the mitigating factors. The Ohio Court of Appeals held as follows:

We have considered Smith's confession, in which he said that Bradford threatened him with a kitchen knife, his difficult childhood, and the personality defect that affected his ability to relate to others. We cannot accept Smith's claim that Bradford induced or provoked Smith's response in light of the uncontradicted physical evidence relative to her slight stature, her severe respiratory disability, the absence of defensive wounds and marks on her body as noted by the coroner, the ten

stab wounds, and the location of Bradford's blood and bloody clothing in her apartment. Nor can we find that Smith's childhood and personality defect, when compared to the nature and circumstances of the offenses herein, are of a quality to mitigate his sentence to the extent that the aggravating circumstances of rape and aggravated robbery do not outweigh the mitigating factors beyond a reasonable doubt.

*State v. Smith*, No. C-880287, 1990 WL 73974, at *9 (Ohio Ct. App. June 6, 1990) (per curiam).

In its independent reweighing, the Ohio Supreme Court concluded that:

> When weighing the aggravating circumstances against mitigating factors, we find that the aggravating circumstances do outweigh the mitigating factors beyond a reasonable doubt. The aggravating circumstances are substantial–the rape and robbery of a helpless woman in her own home by someone she invited in. In contrast, the mitigation case appears inconsequential. While unfortunate, Smith's upbringing did not result in a mental disease or defect, as opposed to a character defect. Smith vacillates between accepting responsibility for what occurred and trying to shift the blame onto others. His claims lack authenticity, and he has not solidly demonstrated any remorse, sorrow, repentance, or desire for rehabilitation.

*State v. Smith*, 574 N.E.2d 510, 521 (Ohio 1991).

### E. State Post-Conviction Proceedings

The OPD represented Smith in his state post-conviction proceedings. The OPD investigated Smith's background and produced Hamilton County Social Services Records. Post-conviction counsel also contacted several clinical psychologists to evaluate Smith for organic brain dysfunction,

apparently because he had been hospitalized at Longview as a child, and was administered both shock therapy and anti-psychotic drugs.

Dr. Robert Smith, a clinical psychologist who specializes in substance abuse and treatment, administered a series of tests designed to detect the extent of Smith's chemical dependence. Dr. Smith diagnosed Smith with cocaine dependence, cannabis dependence, and alcohol dependence. Dr. Smith opined that "the court ordered evaluations were remiss in adequately assessing the extent and impact of [Smith's] alcohol and substance abuse." Dr. Smith also stated that it was "plausible" that Smith had consumed alcohol, marijuana, and cocaine on the evening of the offense, and that, "[g]iven the data reported, it is likely that Mr. Smith's ability to adequately judge the consequences of his behavior and to act in his own best interest may have been impaired."

Dr. James Dobbins, a clinical psychologist, also evaluated Smith. Dr. Dobbins stated that he reviewed materials provided by counsel[7], conducted two clinical interviews with Smith and administered the MMPI, the Shipley Institute Living Scale, Defense Scale of Jackson Personality Research Scale, and the Thematic Apperception Test. Dr. Dobbins determined that Smith "has many background and developmental problems which would contribute to a poor psychological adjustment in adult life." Like Dr. Schmidtgoessling, Dr. Dobbins noted that Smith suffered from malnutrition and resulting vitamin deficiencies as a neonate, as well as pneumonia. Dr. Dobbins stated that Smith

---

[7] Dr. Dobbins stated that he reviewed the following materials:
Cincinnati Public School Records
Hamilton County Psychiatric Court Clinic Records
Affidavits of friends and family members of William H. Smith
Transcript of Mitigation Hearing
Transcript of statement to Cincinnati Police
Case conferences with staff from the Ohio Public Defender Commission

was raised in a severely disturbed family. Dr. Dobbins noted that Smith was placed in foster care, and then Longview State Hospital. Dr. Dobbins further noted that while at Longview, Smith was administered a psychotropic drug. Dr. Dobbins confirmed that Smith experienced a great deal of physical abuse from his parents and other caregivers.

Dr. Dobbins concluded that Smith's "school and social problems are more likely due to his chaotic family structure and the likelihood of neurological impairment from perinatal and postnatal infections, vitamin deficiencies, and long term alcohol abuse." He diagnosed Smith as DSM III-R Axis I 305.00 Alcohol Abuse, 304.30 Cannabis Abuse, 304.20 Cocaine Dependence; and Axis II 300.90 Unspecified Mental Disorder (nonpsychotic) with antisocial features.

Dr. Kathleen Burch, a clinical psychologist, also evaluated Smith to determine whether Smith showed signs of "cerebral dysfunction" that might have contributed to "adaptive deficits." Dr. Burch administered a battery of neuropsychological tests.[8] Like Drs. Schmidtgoessling and Dobbins, Dr. Burch noted that Smith was hospitalized as an infant with pneumonia and vitamin deficiency. Dr. Burch

---

[8]Dr. Burch stated that she administered the following tests: Wechsler Adult Intelligence Scale-Revised; Wechsler Memory Scale-Revised; Category Test; Speech Sounds Perception Test; Seashore Rhythm Test; Finger Oscillation Test; Aphasia Screening Test; Frontal Lobe Battery; Trail Making Test; Complex Figure Test; California Verbal Learning Test; Developmental Test of Visual-Motor Integration; Tactual Performance Test; Hooper Visual Organization Test.
Dr. Burch also stated that she reviewed the following materials provided by counsel:
Police Report
Reports of Previous Psychological Evaluations
Treatment Summaries
Affidavits of Friends and Family Members of William H. Smith
Case conferences with staff from the Ohio Public Defender Commission

reported that Smith denied any history of seizures or head injuries resulting in unconsciousness. She noted that Smith's mother was frequently under psychiatric care, that he was in various foster placements, and that at age eight, Smith was probated to Longview and was medicated with Thorazine during hospitalization. Dr. Burch observed that "[h]istory of alcohol and substance abuse has also been inconsistent."

Dr. Burch concluded that Smith had a "mild, diffuse cerebral dysfunction." Dr. Burch noted that Smith "earned a Halstead-Reitan Impairment Index of 0.7, which would suggest a moderate level of impairment." She added: "However, his performance was no more than mildly impaired on any of the measures--evidence against the presence of a discrete lesion. While the results are not strongly lateralizing, there does appear to be more left hemisphere impairment."

Dr. Burch further observed that Smith's "dysfunction appears static--that is, nonprogressive. There is no evidence of an acute lesion, or ongoing toxic, metabolic, or infectious process." She noted that Smith's deficits appeared on tasks involving functions associated with frontal lobe activity such as difficulties in maintaining a cognitive set, and decreased flexibility in thinking. She further noted that his concentration and attention skills are impaired. She observed that:

The pattern of results suggests either the sequelae of diffuse traumatic brain damage or of chronic alcohol abuse. He has marked difficulty with attention and concentration may be more long-standing, and the result of developmental deficit. If the deficits do, indeed result from alcoholism, they would be expected to reflect some improvement resulting from extended sobriety. In other words, if he had been tested shortly after his arrest, the test results would have most likely indicated more severe dysfunction. It is unlikely that continued abstinence would result in an further improvement of his cognitive

status. . . . Overall, the results suggest mild attentional problems, difficulty with concentration and mental tracking, mild problems with nonverbal and verbal reasoning, and a tendency to show low initiative and respond to the obvious. The results are consistent with a pattern of diffuse, mild cerebral impairment.

Dr. Burch's tests results were similar to those of earlier reports. On the WAIS-R, Smith scored a verbal IQ of 85, a performance IQ of 89, and a full scale IQ of 85.

In her conclusions, Burch reiterated that

[t]he results, again, are more suggestive of the sequelae of chronic alcohol abuse or, possibly of repeated head trauma. . . . The deficits observed characteristically are associated with poor impulse control and deficient planning and problem solving.

The state post-conviction trial court denied Smith's motion without an evidentiary hearing. The Ohio Court of Appeals rejected Smith's claim of ineffective assistance of counsel in the mitigation phase. The court reasoned that:

The affidavits [of family members and psychologists] share a common theme, *i.e.,* that Smith's early years were fraught with instability, abuse, neglect and a total lack of parental love and support. During the mitigation hearing, Smith's mother, two uncles, his minister and a psychologist testified concerning their opinions that Smith had an unstable and difficult childhood, that he had a history of substance-abuse problems, that he was a follower and could be easily manipulated and that he had personality disorders which prevented him from relating to others.

The trial court, in its opinion, stated that it "recognize[d] Smith's personality disorders and difficult childhood as a mitigating factor." We conclude that the

evidence of Smith's unfortunate upbringing, substance-abuse history and personality disorders, as set forth in the supporting affidavits, was merely cumulative to that presented at the mitigation hearing. Consequently, we uphold the trial court's conclusion that Smith has presented no documentary evidence demonstrating prejudice[.]

*State v. Smith*, No. C-930404, 1994 WL 273267, at *4 (Ohio Ct. App. June 22, 1994) (per curiam). The Ohio Supreme Court summarily dismissed Smith's appeal from that decision.

### F. Federal Habeas

The district court held that trial counsel's investigation and preparation for mitigation were not ineffective. The district court noted in particular that trial counsel called as its expert witness Dr. Schmidtgoessling, who presented information that tended to establish several mitigating factors. *Smith v. Anderson*, 104 F. Supp.2d 773, 809 (S.D. Ohio 2000). The court held that Smith "fail[ed] to establish that counsel were ineffective and that Petitioner suffered prejudice from any alleged deficiency, in light of the overwhelming evidence that affirms the reliability of both the finding of guilt and the imposition of sentences." *Id.*

### II. Standard of Review

Petitioner's habeas application was filed in 1995, prior to the enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA"); the pre-AEDPA standard of review therefore applies. *Coleman v. Mitchell*, 268 F.3d 417, 427 (6th Cir. 2001); *Mapes v. Coyle*, 171 F.3d 408, 413 (6th Cir. 1999). Under that standard, we presume the correctness of the state court factual findings, unless rebutted by clear and convincing evidence, and we review determinations of law, or mixed questions of fact and law, *de novo. Coleman*, 268 F.3d at 427; *Mapes*, 171 F.3d at 413. We may not issue a writ of

habeas corpus unless the state court proceedings were fundamentally unfair as a result of a violation of the Constitution or laws or treaties of the United States. *Powell v. Collins*, 328 F.3d. 268, 280 (6th Cir., 2003).

### III. Analysis

### A. Ineffective Assistance of Trial Counsel

### 1. Mitigation

Smith argues that the district court erred in concluding that Smith was not denied constitutionally effective assistance of counsel in the penalty phase of his trial. The Sixth Amendment to the United States Constitution provides, *inter alia*, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. As the Supreme Court stated in *Strickland*, "the Sixth Amendment right to counsel exists," and is necessary "to protect the fundamental right to a fair trial." *See Strickland v. Washington*, 466 U.S. 668, 684 (1984). A fair trial "is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding." *Id.* at 685. Counsel plays a critical role in the adversarial system embodied in the Sixth Amendment because counsel's skill is needed to accord a defendant the "'ample opportunity to meet the case of the prosecution.'" *Id.* (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275 (1942)). Thus, "'the right to counsel is the right to the effective assistance of counsel.'" *Id.* (quoting *McMann v. Richardson*, 397 U.S. 759, 771, n.14 (1970)). In defining the constitutional requirement of effective assistance, the *Strickland* court stated:

> In giving meaning to the requirement, however, we must take its purpose–to ensure a fair trial–as the guide. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper

> functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

*Id.* at 686. This principle applies equally to a capital sentencing proceeding. *Id.* at 686-87.

In *Strickland*, the Supreme Court set forth a two-part test for evaluating ineffective assistance of counsel claims. First, the defendant must demonstrate that counsel's performance was deficient in that counsel's errors were so serious that counsel was not functioning as constitutionally guaranteed. *Id.* at 687. Second, the defendant must establish that the inadequate assistance prejudiced the defense. To establish prejudice, the defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

The proper standard for attorney performance is reasonably effective assistance. *Id.* Thus, to establish cause, the defendant must show that counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688. Reasonableness is determined by considering all the circumstances. *Id.*

To show prejudice, the defendant must demonstrate to a reasonable probability that, but for counsel's errors, the result would have been different. *Id.* at 694. In the context of a challenge to a death sentence, the prejudice question is "whether there is a reasonable probability that, absent the errors, the sentencer–including an appellate court, to the extent it independently reweighs the evidence–would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695.

These principles are not mechanical rules, rather principles to guide the process of deciding whether the challenged proceeding was fundamentally fair. *Id.* at 696. Thus, the court deciding an ineffective assistance claim need not

approach the inquiry in the same order or even address both prongs if the defendant fails to establish one. *Id.* at 697.

Smith characterizes his ineffectiveness claims as sins of omission and affirmative mistakes. As for omissions, Smith claims that counsel were ineffective in investigating and preparing for mitigation for failing to (1) communicate and follow through with mitigation experts at the OPD, namely Core, (2) communicate and follow through with Schmidtgoessling once she was appointed as a "friend of the court" expert, (3) investigate Smith's background, (4) develop an effective strategy for the mitigation hearing, and (5) request a full psychiatric examination, given Smith's history at Longview State Hospital. Smith claims that, as a result, the trial counsel failed to present a full picture of Smith's tragic life. As for affirmative mistakes, Smith claims deficient performance in counsel's decision to allow his mother, who is schizophrenic, to read a statement that contained damaging information. He also faults counsel for introducing the testimony of his former pastor, who revealed that Smith beat his wife.

Smith alleges that all of the foregoing omissions resulted in less than full and accurate mitigation evidence. Smith argues that post-trial evidence shows that he was born to a single mother, one of six children, with many different fathers. Further, his family was poor and uneducated, and involved with social services even before his birth. Smith points out that the records reveal that he had a traumatic infancy, including that his mother was schizophrenic and that his biological father was uninvolved. Smith notes further that he lived in foster homes, was abused by his stepfather, and that he himself was committed to Longview for five and one-half years, where he received shock therapy, and antipsychotic drugs. Smith adds that his I.Q. is in the borderline mentally retarded range, and that he has been diagnosed with diffuse organic brain impairment which was present at the time of the crime.

We find no cause or prejudice under *Strickland* because *all of this evidence was presented at mitigation.*[9] As exhaustively detailed above, virtually all of the mitigating elements that Smith complains of were presented via Dr. Schmidtgoessling's testimony and her mitigation report. In her testimony, Dr. Schmidtgoessling explained that Smith's mother had a history of mental illness, that his biological father was uninvolved, that he was placed in a number of foster homes and at Longview. She described the lack of structure, nurturing, and the physical and emotional abuse. Dr. Schmidtgoessling also stated that his IQ was in the borderline mentally retarded range, and that he abused alcohol, marijuana, and cocaine. Dr. Schmidtgoessling's mitigation report describes in greater detail Smith's family background, developmental history, his commitment to Longview, and his later functioning as a young adult. In fact, we are at somewhat of a loss in trying to discern what evidence Smith believes was *not* presented at mitigation. Smith himself fails to identify *which* documents were available and reviewed by OPD at the post-conviction phase, but not reviewed by Dr. Schmidtgoessling.

The foregoing facts were obviously part of the record because both the Ohio Court of Appeals and the Ohio

---

[9]In the dissent's view, "the facts of this case lead [it] to the same conclusion" as held in *Powell*, "that the testimony of a defense expert may have provided facts and information to consider at mitigation which may have led to a different sentence." Specifically, the dissent points out that "Smith endured an exceedingly difficult childhood," that he "spent time living with abusive foster parents," that he "was diagnosed with diffuse cerebral dysfunction," and that he "spent time in a juvenile psychiatric facility where, among other things, he received electric shock therapy." The dissent ignores the fact that, as the majority opinion documents, all of this evidence was presented at mitigation, in Dr. Schmidtgoessling's testimony and in her mitigation report. The three-judge sentencing panel reviewed all of this evidence, as did the Ohio appellate courts in their independent reweighing of the aggravating circumstances against the mitigating factors.

Supreme Court referred to them upon direct review. The Ohio Court of Appeals found that

> Smith's psychiatric history reflected that he was abused as a child by his mother and stepfather. At ten years of age he spent three years in Longview Hospital's children's unit. He dropped out of school–according to Schmidtgoessling, in the tenth grade–with a history of hyperactivity, learning deficiency, poor achievement, and disciplinary problems. Dr. Schmidtgoessling found that Smith's IQ fluctuated, but that he was not retarded. Smith told her that he had a long-standing history of alcohol and marijuana use and a two-year history of cocaine use, which she described as "moderate." Dr. Schmidtgoessling concluded that Smith did not have a mental illness or defect, but suffered from a nonorganic personality defect that made him impulsive and "sensitive to being ripped off."

*State v. Smith*, 1990 WL 73974, at *9. The Ohio Supreme Court, as part of its independent reweighing of aggravating and mitigating factors on direct appeal, characterized the psychological evidence presented during mitigation in the following manner:

> Smith, born in October 1957, came from a chaotic home environment, with a schizophrenic, abusive, neglectful mother, and an unknown father. Early psychological reports on Smith showed problems. A psychologist in 1964 termed him "emotionally disturbed." In 1965, a psychologist said his "reality contact was 'precarious'" and his "thinking sometimes borders on autistic." In 1965, after acting destructively and setting a fire, he was committed to Longview, a state mental hospital. In childhood, he displayed "hyperactivity, some learning problems secondary to distractibility, poor achievement in school, a lot of behavior problems, stealing, fighting in school."

*State v. Smith*, 574 N.E.2d at 519. The Ohio Supreme Court also noted Smith's IQ scores, his reported alcohol and substance abuse, his ongoing anti-social behavior as an adult, his hypersensitivity, and the lack of schizophrenia, retardation, or any major psychological disorder. *Id.* at 519-20. Like the trial court, the Ohio Supreme Court weighed these mitigating factors:

> Smith's history, character, and background do offer mitigating features. Smith clearly had an arduous childhood, and his early life shaped a personality with serious character defects. His limited mental capacity, childhood deprivation, and alcohol and drug dependency all reflect mitigating features. We find his history and background to be a mitigating factor, as did the trial court.

*Id.* at 520; *see also id.* at 521 ("As to significant 'other factors,' we recognize Smith's deprived childhood, flawed upbringing, character defects, and drug and alcohol dependency as mitigating."). In other words, trial counsel was not ineffective because all the information of which Smith complains was presented to the sentencing panel, and was part of the record before the Ohio Court of Appeals and the Ohio Supreme Court.

From what we can tell, the *only* allegedly new mitigating evidence that Smith presents is that he suffers from organic brain damage. That evidence is not compelling, however, because it is not conclusive. Dr. Smith never states that Smith suffers from organic brain damage. The closest thing to organic brain damage in Dr. Smith's statement is that Smith was dependent on alcohol, marijuana, and cocaine, and that each of these chemicals affects the central nervous system. But Dr. Schmidtgoessling herself also documented Smith's substance abuse. And Dr. Smith merely opined that it was "plausible" that Smith had abused substances on the night of the offense, and that if he did, it was "likely" that Smith's judgment was impaired.

Dr. Dobbins likewise did not diagnose Smith with organic brain damage, concluding only that there is a "*likelihood* of neurological impairment." Nor did Dr. Dobbins ever explain whether this likelihood of neurological impairment would have impacted Smith's criminal act. Dr. Burch diagnosed Smith with *"mild* diffuse cerebral dysfunction." She further stated that Smith's "performance was no more than mildly impaired on any of the measures[.]" More telling, Dr. Burch identified only one deficit that was relevant to Smith's actions on the night of the murder--poor impulse control. Dr. Burch did not opine that Smith's impairment constituted either diminished capacity or insanity under Ohio law.

Although he faults trial counsel for failing to obtain a neuropsychological examination that would reveal evidence of organic brain damage, post-conviction counsel's efforts on that score were equally unavailing. In essence, then, the only evidence the sentencing panel did not hear was that Smith suffered from a lack of impulse control. Yet, this was not new evidence, because as the Ohio Court of Appeals noted on direct appeal, Schmidtgoessling concluded that Smith suffered from a nonorganic personality defect that made him "impulsive." *See State v. Smith*, 1990 WL 73974, at *9. Thus, as the Ohio Court of Appeals stated on post-conviction review, the evidence presented "was merely cumulative to that presented at the mitigation hearing." *State v. Smith*, 1994 WL 273267, at *4. Furthermore, as the Warden points out, the fact that Smith forcefully stabbed the victim ten times, then had sex with her a second time, and made four separate trips to take her property to his car, and then left her to die, belies any plausible claim of lack of impulse control.

Other than the slim evidence of a "mild diffuse cerebral dysfunction," which manifested primarily as poor impulse control, Smith has failed to point to any mitigating evidence that was not actually presented. Absent the existence of some actual medical proof of an organic brain disorder, there can be no cause in the failure to find and present it, and obviously no prejudice either. *See Thompson v. Bell*, 315 F.3d 566, 590

(6th Cir. 2003); *Lorraine v. Coyle*, 291 F.3d 416, 436 (6th Cir. 2002), *cert. denied*, 123 S. Ct. 1621 (2003). In short, trial counsel's performance was not unreasonable.

The remaining alleged omissions are of minor magnitude, and do not reflect objectively unreasonable performance, let alone prejudice. Smith criticizes trial counsel for failing to consult with Core. The record shows that Smith's trial counsel made initial contact with Core in January 1988, and that counsel actually sent her some materials regarding Smith, including Schmidtgoessling's NGRI report, which was quite comprehensive. Thus, Smith is incorrect to the extent he suggests that counsel did not provide any materials to Core. It also appears that trial counsel were stymied in their efforts because Core refused to proceed further without funding, and trial court did not order funds until late February 1988. It is not clear why counsel ultimately switched to Dr. Schmidtgoessling. Core is probably a qualified mitigation expert, but the record reflects that Dr. Schmidtgoessling is too. Dr. Schmidtgoessling has been involved with death penalty cases since Ohio's modern death penalty statute went into effect in 1981, and her NGRI and mitigation reports as well as her testimony demonstrate that she was very thorough in her investigation of Smith's background in the quest for mitigating evidence. In fact, Dr. Schmidtgoessling testified that she usually became involved in mitigation at the instruction of the OPD or from a private defense attorney. Furthermore, counsel had Dr. Schmidtgoessling's NGRI report, so at the time they decided to use her instead of Liverani, they had a good idea of what mitigation evidence she would present. A comparison of the NGRI report and mitigation report confirm this. Thus, it simply cannot be said that counsel's choice of Dr. Schmidtgoessling as their mitigation expert was deficient. *Cf. Wickline v. Mitchell*, 319 F.3d 813, 820-22 (6th Cir. 2003) (holding that trial counsel were not ineffective for failing to perform a separate mitigation investigation; counsel testified that their pretrial investigation was conducted for both guilt phase and mitigation phase purposes and the mental health evidence

submitted with the petitioner's petition for post-conviction relief indicated that the petitioner did not suffer from any mental condition relevant to the murders; even if deficient performance, the petitioner failed to show prejudice).

Smith criticizes counsel for failing to investigate on their own. He also claims that counsel failed to request records from the Hamilton County Juvenile Court or the Hamilton County Department of Human Services. However, Dr. Schmidtgoessling testified that trial counsel requested and received from her the documents that formed the basis of her NGRI report. Thus, even if trial counsel's performance was deficient, there is no prejudice. In any event, prior to mitigation counsel interviewed several witnesses, including Smith's wife, grandmother, and other relatives. Smith faults counsel for not meeting with his mother prior to the mitigation hearing. Again, even if Smith could somehow demonstrate cause on this front, Smith has shown no prejudice.

Smith also faults trial counsel for failing to communicate with Dr. Schmidtgoessling once she was appointed as the friend of the court expert, after conviction and just prior to mitigation. From Dr. Schmidtgoessling's deposition testimony it appears that counsel may not have been up to speed on mitigation evidence at certain points during pretrial preparation. Yet again, even if we were to conclude that trial counsel's purported ill-preparedness prior to the mitigation hearing somehow constituted cause, Smith fails to show any prejudice whatsoever. Indeed, Dr. Schmidtgoessling herself presented a comprehensive portrait of Smith to the sentencing panel, and did not indicate that *she* was ill-prepared. *Cf. Powell*, 328 F.3d at 276 (noting that Dr. Schmidtgoessling testified at petitioner Powell's sentencing hearing that "she was not given sufficient time to conduct an appropriate investigation into Petitioner's mental makeup, to interview necessary family members and acquaintances, or to run needed diagnostic tests"). As we have stated and restated, the sentencing panel had ample mitigating evidence before it, and

Smith has not identified any evidence that counsel overlooked.

For this reason, Smith's reliance on *Williams v. Taylor*, 529 U.S. 362 (2000), and *Glenn v. Tate*, 71 F.3d 1204 (6th Cir. 1995), is misplaced. In both of those cases, the courts identified mitigation evidence that existed but was not presented. *See Williams,* 529 U.S. at 395-98 (finding ineffective assistance of counsel because counsel failed to investigate and introduce evidence of the petitioner's nightmarish childhood, including severe and repeated beatings by his father, and available evidence showing that the petitioner was borderline mentally retarded; also finding prejudice in that the evidence "might well have influenced the jury's appraisal of his moral culpability"); *Glenn*, 71 F.3d at 1207-11 (finding trial counsel ineffective at mitigation due to their failure to develop and present mitigating evidence regarding the petitioner's background, including the fact that in school he had been classified as mentally retarded, and that he suffered organic brain damage, despite its availability). Rather, Smith's situation is more akin to the petitioners in *Thompson,* 315 F.3d 566, and *Lorraine,* 291 F.3d 416, In both cases we found no ineffective assistance of counsel based on the failure to present mitigating evidence of organic brain damage, because the petitioners never established that organic brain damage was present. *See Thompson*, 315 F.3d at 590-92 (and cases cited therein); *Lorraine*, 291 F.3d at 436-39 (and cases cited therein). As we stated in *Lorraine*, "if habeas counsel could not find evidence of organic brain damage, then trial counsel cannot be deemed ineffective" for failing to find it either. *Id.* at 436. *Cf. Mason v. Mitchell*, 320 F.3d 604, 619-27 (6th Cir. 2003) (holding that the petitioner was entitled to an evidentiary hearing on the adequacy of trial counsel's investigation and presentation of mitigation evidence; noting that readily available mitigation evidence which did not enter the record until the post-conviction stage offered an arguably reasonable probability of humanizing the petitioner before the jury such that he might not have been sentenced to death).

Smith's case is also not like a recent decision of this Court, *Powell*. In *Powell*, a panel of this Court found that the petitioner had been deprived of his right to expert psychological assistance at the sentencing phase of his trial. In reaching this conclusion, the *Powell* court emphasized defense counsel's failure to make reasonable investigative efforts, *Powell*, 328 F.3d at 292, and to research and collect necessary information in order to present effective mitigation at the penalty phase. In particular, the *Powell* court noted that defense counsel were ineffective because they failed to investigate the petitioner' background, spent less than two full business days preparing for the penalty phase of the trial, and failed to interview and present numerous mitigating witnesses who were available and willing to testify on the petitioner's behalf. Instead, trial counsel presented only one witness at mitigation, Dr. Nancy Schmidtgoessling, the same expert witness used by trial counsel in this case.

Here, by contrast, trial counsel presented five witnesses at mitigation, and its principal witness, Dr. Schmidtgoessling, presented a comprehensive picture of Smith's family, social, psychological background, based upon extensive review of "[n]umerous sources of information," which included not only psychological tests, but also interviews, hospital records, school reports, and social services records. Furthermore, in this case, Dr. Schmidtgoessling did *not* testify at mitigation that she "was not given sufficient time to conduct an appropriate investigation into Petitioner's mental makeup, to interview necessary family members and acquaintances, or to run needed diagnostic tests." *See id.* at 276. In this case, Dr. Schmidtgoessling also did *not* indicate here, as she did in the *Powell* case, "that Petitioner likely suffered from some organic brain dysfunction and that such a defect could be detected only with tests that had not yet been performed on Petitioner." *See id.* Unlike the petitioner in *Powell*, Smith did not present any "affidavits from friends and family members" who could have offered the jurors "first hand-accounts from those who knew Petitioner best." *See id.* at 292. In short, unlike *Powell*, Smith has not demonstrated that

counsel failed to find and present available mitigating evidence to the sentencing panel. And there is certainly no showing of prejudice, because the sentencing panel *was* presented with ample evidence of Smith's mental makeup. *Powell* is not persuasive.

The most recent decisions of the Supreme Court and this Court further bolster our ruling here. *See Wiggins v. Smith*, 123 S.Ct. 2527 (2003), *and  Frazier v. Huffman*, – F.3d –, No. 01-3122, 2003 WL 22069661 (6th Cir. Sept. 8, 2003). In *Wiggins*, trial counsel's investigation of mitigating evidence consisted of three sources; psychological testing, the written presentence report, which included a one-page account of the petitioner's personal history, and social service records (DSS) documenting the petitioner's placements in foster care. *Wiggins*, 123 S.Ct at 2536. The Supreme Court held that the scope of trial counsel's investigation was unreasonable when counsel failed to investigate the petitioner's social history, despite knowledge from their client's presentence report that he lived in "misery as a youth," and described his own background as "disgusting." The Supreme Court found that counsel's performance was also unreasonable in light of the DSS records, which revealed that the petitioner's mother was a chronic alcoholic, and that he was sent to various foster homes. *Id.* at 2537. The *Wiggins* Court stated that "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses. . . . Indeed, counsel uncovered no evidence in their investigation to suggest that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless." *Id.* Cf. *Johnson v. Bell*, – F.3d –, No. 01-5451, 2003 WL 22082176, at * 5-6 (6th Cir., Sept. 10, 2003) (holding that, unlike *Wiggins,* where counsel had sufficient information about their client's abysmal childhood such that their failure to pursue further investigation was objectively unreasonable, "there is nothing to suggest that counsel in the instant case ignored known leads that might have helped them to prepare their case in mitigation"; and that "[t]he mitigating

evidence proffered by petitioner falls short of the quantum required by *Wiggins*, *Cone*, and *Williams*").

In *Frazier*, this Court found counsel's performance was objectively unreasonable for failing to investigate and present evidence of a brain impairment resulting from a fall off a ladder, which they would have discovered from their review of medical records. *Frazier*, 2003 WL 22069661, at *11. Further, affidavits presented during state postconviction proceedings documented the petitioner's head trauma and suggested that a correlation could exist between the petitioner's injury and his head trauma. We held that "[w]e can conceive of no rational trial strategy that would justify the failure of Frazier's counsel to investigate and present evidence of his brain impairment." *Id.*

In stark contrast with *Wiggins* and *Frazier*, "[o]ther than the slim evidence of 'mild diffuse cerebral dysfunction', . . . Smith has failed to point to any mitigation evidence that was not actually presented." Here, principally through the testimony and report of Dr. Schmidtgoessling, the sentencing panel had ample mitigating evidence to weigh against the aggravating circumstances of the crime. To the extent that *Wiggins* and *Frazier* reflect what constitutes ineffective assistance in failing to investigate and develop available mitigating evidence, they confirm that counsel's decision to present the mitigation report and testimony of Dr. Schmidtgoessling detailing Smith's social history was objectively reasonable. *See Strickland*, 466 U.S. at 688

As *Strickland* made clear, our role on habeas review is not to nitpick gratuitously counsel's performance. After all, the constitutional right at issue here is ultimately the right to a fair trial, not to perfect representation. *Strickland*, 466 U.S. at 684. Rather, we are looking to see "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. We cannot say that here, because Smith has offered us no evidence to demonstrate that

counsel failed to present a full and accurate picture of Smith's background to the sentencing panel. Thus, we cannot find cause, because Smith has not identified deficient performance. It therefore follows that we cannot find prejudice either.

### B. Cumulative Errors

Smith also contends that his trial attorneys were ineffective because they failed to rebut testimony that Smith lacked remorse. Smith contends that counsel should have objected, and rebutted this statement with Dr. Weaver's NGRI report, which showed that Smith displayed remorse during his competency review with Dr. Glenn Weaver. In the report, Dr. Weaver indicated that Smith had broken down when describing the crime. Smith claims prejudice "because, absent this improper argument, the balance of aggravating and mitigating factors could have shifted in favor of sparing his life." Br. at 52.

Even if improper, there is no prejudice in light of the overwhelming aggravating (as well as mitigating) evidence presented. Furthermore, the argument was made to a three-judge panel, so any inflammatory effect was de minimis anyway. *Cf. Harris v. Rivera*, 454 U.S. 339, 346 (1981) (per curiam) ("In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions."); *Wickline*, 319 F.3d at 823-24 (holding that the three-judge panel would not likely have been misled by any improper evidence); *United States v. Joseph*, 781 F.2d 549, 552-53 (6th Cir. 1986) (stating that "[i]t is well settled that in a non-jury trial the introduction of incompetent evidence does not require a reversal in the absence of an affirmative showing of prejudice."). Finally, Smith's own confession independently revealed his lack of remorse.

Smith further faults counsel for reading into the record during mitigation his unsworn statement admitting guilt. This claim is also without merit, because it is clear from the record

that this was Smith's decision and not trial counsel's. At counsel's request, the trial court made sure that Smith knew of his right to testify, had created the written statement himself, and had discussed the implications of this strategy with his trial counsel. It was noted on the record that Smith and his trial counsel took a 35 minute recess specifically to discuss this issue with Smith prior to reading the document into the record. Thus, counsel are not to be deemed deficient because they followed Smith's instructions. *See Coleman v. Mitchell*, 244 F.3d 533, 545-46 (6th Cir. 2001) ("An attorney's conduct is not deficient simply for following his client's instructions."). Again, there is no danger of prejudice given the overwhelming evidence in this case.

### C. Ake Violations

Smith argues that the trial court's refusal to provide him with independent expert assistance during mitigation violated *Ake v. Oklahoma*, 470 U.S. 68 (1985), and that trial counsel's failure to request that an expert be provided violated *Strickland*.

In *Ake*, the Supreme Court held that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue, if the defendant cannot otherwise afford one." *Ake*, 470 U.S. at 74; *id.* at 83 ("We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense."). The *Ake* Court also stated that a similar conclusion was required "in the context of a capital sentencing proceeding, when the state presents psychiatric evidence of the defendant's future dangerousness." *Id.* at 83. At the same time, the *Ake* majority emphasized that its ruling was limited to cases in

which the defendant's mental condition was "seriously in question" upon the defendant's "threshold showing." *Id.* at 82. Furthermore, the Court held that the state was obliged merely to provide one competent psychiatrist, and that it could choose that psychiatrist. In other words, the defendant's right does not include the right to a psychiatrist of his choice. *Id.* at 83 ("This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own.").

This Court has interpreted *Ake* as allowing psychiatric assistance during the sentencing phase if 1) the defendant's sanity was a significant factor at trial, or 2) the state presents at sentencing psychiatric evidence of future dangerousness. *Mason*, 320 F.3d at 615-16; *Thompson*, 315 F.3d at 588-89; *Skaggs v. Parker*, 235 F.3d 261, 272 (6th Cir. 2000); *United States v. Osaba*, 213 F.3d 913, 917 (6th Cir. 2000); *Kordenbrock v. Scroggy*, 919 F.2d 1091, 1120 (6th Cir. 1990) (en banc opinion of Kennedy, J., with five Judges concurring and one Judge concurring in the result).

Smith's claim fails because Smith's sanity was not a significant issue during trial *principally because Smith withdrew his insanity defense*. Smith initially raised an insanity defense and, as a result, the trial court ordered three psychiatric evaluations prior to trial. Each expert uniformly concluded that Smith did not suffer from any mental illness. Smith then withdrew his insanity defense. Thus, he does not meet the first test under *Skaggs*. Smith also does not argue that the prosecution presented evidence of future dangerousness. He therefore did not have a right to any psychiatric assistance at sentencing. *Mason*, 320 F.3d at 616 (holding that the petitioner did not have a clearly established right to any psychiatric assistance at sentencing because the State of Ohio did not present any psychiatric evidence of the defendant's future dangerousness).

Even so, the trial court appointed Schmidtgoessling during the mitigation phase. Smith complains that he was entitled to an independent psychiatrist, rather than a "friend of the court" appointment. *Ake* does not entitle him to the psychiatrist of his choosing, only a competent psychiatrist. *Ake*, 470 U.S. at 83; *Mason*, 320 F.3d at 616; *Thompson*, 315 F.3d at 588.[10]

---

[10]We recognize that a panel of this Court recently held that "an indigent criminal defendant's constitutional right to psychiatric assistance in preparing an insanity defense is not satisfied by court appointment of a 'neutral' psychiatrist–i.e., one whose report is available to both the defense and the prosecution." *Powell v. Collins*, 328 F.3d 268, 284 (6th Cir. 2003). However, this "holding" is contrary to *Ake* and our own precedent. *See Ake*, 470 U.S. at 83 ("That is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed . . . ."); *Thompson*, 315 F.3d at 588.

Furthermore, the panel's "holding" appears to be dicta, because it does not appear that the *Powell* petitioner's *sanity* was actually at issue during trial. Rather, it appears that only Powell's competency to stand trial and his mental condition were at issue. *See Powell*, 328 F.3d at 275 ("Defense counsel then filed a suggestion of incompetency."); *id.* ("Finally, [Dr. Schmidtgoessling] testified that, although Petitioner has a mild mental defect, his condition did not meet the legal definition of insanity because that defect is not "of sufficient severity to cause him to be incapable of knowing right from wrong or to restrain himself from doing a certain act."); *id.* ("The trial judge again denied the motion and found Petitioner competent to stand trial."); *id.* at 286 ("Dr. Tanley's after-the-fact post-conviction testimony does nothing to change the harmlessness of the trial court's error because the fact that one has difficulty conforming his conduct to the requirements of the law 'is not enough to prove insanity;' one must demonstrate the lack of capacity to do so.").

In any event, although relevant here (because this case is also pre-AEDPA), the *Powell* panel's "holding" is of limited precedential value because the habeas petition in that case was filed prior to the AEDPA. Under the AEDPA, the federal constitutional right must have been clearly established at the time of the state court decision. As the panel's opinion acknowledges, *Ake* did not hold that due process requires the State to provide an independent psychiatrist, merely a competent one. The panel's "holding" is an extension of *Ake*. *See Powell*, 328 F.3d at 284 ("Today,

---

Smith's ineffective assistance of counsel claim must be rejected because, as he himself admits in his brief, his attorneys requested an independent psychiatrist for the mitigation phase, but the trial court denied the motion. "Months prior to trial, the trial court denied a defense request for an independent mental health professional at the penalty phase." Brief at 53. Thus, Smith's trial counsel cannot be ineffective for failing to request an independent psychiatrist. Furthermore, "[w]e have never found counsel to be ineffective solely because the expert used was on the State payroll." *Martin v. Mitchell*, 280 F.3d 594, 614 (6th Cir.), *cert. denied*, 123 S. Ct. 515 (2002).

Smith also argues that the trial court erred in denying him a drug and alcohol expert at the culpability phase. This argument must likewise be rejected. Dr. Schmidtgoessling testified to Smith's long history of substance abuse and its effects on him. Dr. Schmidtgoessling's testimony was sufficient for the Ohio Supreme Court to conclude that Smith's drug and alcohol abuse constituted a mitigation factor. *See State v. Smith*, 574 N.E.2d at 520.

For all the reasons discussed in the preceding section, Smith has not shown that he was prejudiced by counsel's use of Dr. Schmidtgoessling rather than some other hypothetical expert. Trial counsel is frequently faulted for failing to obtain the "right" expert. Unless habeas counsel can locate and produce this mythic expert, there can be no cause or prejudice. Such is the case here. As Dr. Schmidtgoessling stated, Smith has a "personality disorder," most certainly caused by his unfortunate upbringing. But there is no proof that he has organic brain damage or any other diagnosed

---

we join those *circuits* that have held that an indigent criminal defendant's constitutional right to psychiatric assistance in preparing an insanity defense is not satisfied by court appointment of a "neutral" psychiatrist[.]" (Emphasis added.)). State courts obviously cannot, therefore, violate the AEDPA by holding that *Ake* merely requires a competent psychiatrist, and not an independent one.

mental disease or defect. Indeed, at pretrial, three mental health experts failed to detect any indicators of possible organic brain damage. At post-conviction, three mental health experts, hand-picked by habeas counsel, failed to come up with a diagnosis of organic brain damage. It is therefore not possible to fault trial counsel for accepting the conclusion of three court-appointed mental health experts, and strategically deciding to rely on Dr. Schmidtgoessling to present an *exhaustive* presentation of the evidence she did have after an extensive review of numerous records. In short, Smith has not demonstrated that any of the alleged failings by trial counsel prejudiced his right to a fundamentally fair mitigation proceeding. Indeed, as every court that has reviewed the issue has determined, although there was certainly abundant mitigation evidence presented, it could not outweigh the aggravating circumstances found in this brutal crime.

We now turn to the remainder of Smith's arguments. Respondent argues that many of them have been procedurally defaulted. Because all are without merit, we will briefly dispose of them on those grounds, assuming without deciding, solely for purposes of expediting somewhat the analysis, that they have not been procedurally defaulted.

### D. Ineffective Assistance of Appellate Counsel

Smith maintains that he received ineffective assistance of appellate counsel. He alleges that Supreme Court counsel was ineffective for filing the wrong pleading, failing to consult with him regarding his case prior to the filing of his appellate brief, and failing to raise meritorious issues.

This claim is without merit. Smith demonstrated absolutely no prejudice from counsel's misnaming of a pleading in the Supreme Court, or its alleged failure to consult with him. As to counsel's purported failure to raise meritorious issues, we agree with the district court's analysis and incorporate it by

reference here. *See Smith v. Anderson,* 104 F. Supp.2d at 839-40.

### E. Consideration of Nonstatutory Aggravating Circumstances

Smith argues that the trial court erred by including nonstatutory aggravating factors in their sentencing decisions. Specifically, Smith contends that the trial court used the nature and circumstances of the offense as a nonstatutory aggravating circumstance although the Ohio statute requires the nature and circumstances be considered as mitigating factors. *See* Ohio Rev. Code § 2929.04(B). As the Ohio Supreme Court concluded:

> Smith's argument lacks merit because the panel's opinion listed only the nature and circumstances of the offense as a possible, but not relevant, mitigating factor. Their opinion did not list any nonstatutory aggravating circumstances. Their reference to the nature and circumstances of the offense was proper, since "[u]nder R.C. 2929.03(F), a trial court or three-judge panel may rely upon and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors." *State v. Stumpf*, (1987) . . . 512 N.E.2d 598, paragraph one of the syllabus.

*State v. Smith*, 574 N.E.2d at 518.

Upon review, we agree with the district court that the Ohio Supreme Court "reasonably and correctly determined that the trial court followed the dictates of state law in performing its penalty-phase deliberations at trial." *Smith v. Anderson,* 104 F.Supp.2d at 820. The states have wide latitude to structure sentencing procedures. *See Boyde v. California*, 494 U.S. 370, 376 (1990). Thus, as the district court held, to the extent that Smith states a constitutional claim cognizable on habeas,

it is foreclosed by well established Supreme Court precedent. *See Smith v. Anderson*, 104 F. Supp.2d at 820.

Even if the Ohio Supreme Court's analysis of Ohio law was incorrect there is no constitutional violation. The United States Supreme Court has held that once a defendant is found eligible for death based on a constitutionally sufficient narrowing circumstance, the sentencer's discretion is virtually unlimited. *See Zant v. Stephens*, 462 U.S. 862, 878-79 (1983). Furthermore, the Supreme Court has also held that consideration of a non-statutory aggravating circumstance, even if contrary to state law, does not violate the Constitution. *Barclay v. Florida*, 463 U.S. 939 (1983). This claim is without merit.

### F. Imposition of Multiple Death Sentences

Smith contends that he has two aggravated murder convictions and two death sentences for a single homicide, in violation of double jeopardy. The trial court's entry of sentence imposes the death penalty as to Count 1 and as to Count 2, and further provides that "[t]he sentences for Counts 1 and 2 will run concurrent." Among other guarantees, the Double Jeopardy Clause seeks to protect against multiple punishments for the same offense imposed in a single proceeding, *see North Carolina v. Pearce*, 395 U.S. 711, 717 (1969); *Jones v. Thomas*, 491 U.S. 376, 386-87 (1989) (same; citing *Pearce*). Even if there were error here, it cannot be said that the error a "substantial and injurious effect" resulting in "actual prejudice." *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993); *Lorraine*, 291 F.3d at 444 (and cases cited therein). "[T]he fact is that Smith will not be executed twice for a single murder." Warden's Br. at 68-69.

### G. Prosecutorial Misconduct

Smith presents four categories of prosecutorial misconduct: 1) racism pervading the charging decision, 2) prosecutorial misconduct during the culpability phase, 3) prosecutorial

misconduct during the mitigation phase, including improper introduction of lack of remorse, insanity standard, and improper remarks, and 4) cumulative effect of prosecutorial misconduct.

In *Darden v. Wainwright,* 477 U.S. 168, 181 (1986), the Supreme Court noted that on habeas review, "the relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the conviction a denial of due process.'" In addition this Court has stated that "[w]hen a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Hutchison,* 303 F.3d at 750 (internal quotation omitted). In other words, habeas relief is warranted if the prosecutor's conduct was "'so egregious so as to render the entire trial fundamentally unfair." *Id.* (internal quotation omitted).

### 1. Racism Pervading the Charging Decision

Smith, who is African-American, argues that the *ad hoc* policies adopted by the Hamilton County Prosecutor's Office reflect a racial bias in charging and prosecuting capital offenses. According to Smith, based upon the 1980 census data prepared by the U.S. Bureau of Census, the population of Hamilton County was nineteen percent African-American in 1980. Further, since Ohio's current death penalty law became effective on October 29, 1981, roughly 62% of the death sentences in Hamilton County have been imposed upon African-Americans even though they consist of only 20% of the county's population. Smith contends that because the administration of capital punishment in Ohio is infected with racism, Ohio's administration of capital punishment, as applied to him, violates the Eighth and Fourteenth Amendments.

The thrust of Smith's argument is that the death penalty is disproportionately applied to blacks, an argument we rejected in *McQueen v. Scroggy*, 99 F.3d 1302, 1333 (6th Cir. 1996)

(holding that "the evidence offered by McQueen amounts to the same kind of statistical studies that the Supreme Court found insufficient in *McClesky v. Kemp*, 481 U.S. 279, 297 (1987)). Moreover, in *Coleman v. Mitchell*, 268 F.3d 417, 441-42 (6th Cir. 2001), we rejected a challenge to Ohio's capital sentencing based on statistics similar to those Smith presents. In *Coleman*, the petitioner relied on a study finding a discrepancy between the Ohio representation in the Ohio population generally (9%), and on death row (49%). We held that "[a]lthough the racial imbalance in the State of Ohio's capital sentencing system is glaringly extreme, it is no more so than the statistical disparities considered and rejected by the Supreme Court in *McClesky* as insufficient to 'demonstrate a constitutionally significant risk of racial bias affecting the . . . capital sentencing process.'" *Coleman*, 268 F.3d at 441-42 (quoting *McClesky*, 481 U.S. at 313).

Smith also argues prosecutorial intent. "[T]o prevail under the Equal Protection Clause, [a defendant] must prove that the decisionmakers in *his* case acted with discriminatory purpose." *McClesky*, 481 U.S. at 292. The district court permitted discovery on this issue. In his deposition, the former Hamilton County Prosecutor, Judge Ney, stated that he met with supervisors in making the capital indictments and that the voting group consisted of six to eight persons. However, his former-first assistant indicated in a sworn statement that only Ney and himself would make the decision. Smith also points out that the Hamilton County Prosecutor's office has no written policies or procedures regarding the indictment of death cases. Regarding Smith's case in particular, they had "no independent recollection of the defendant, the facts or anything surrounding this case." Ney also stated that no records would be kept of the decision to indict. Thus, according to Smith, Ney could not provide a race-neutral explanation.

Smith's claim must fail. Ney was not obliged to provide a race- neutral explanation. Further, his inability to provide an explanation supports the logic in *McClesky* that "[r]equiring

a prosecutor to rebut a study that analyzes the past conduct of scores of prosecutors is quite different from requiring a prosecutor to rebut a contemporaneous challenge to his own acts." *McClesky*, 481 U.S. at 296 n.17. Smith has not met his burden of establishing a prima facie case of unconstitutional conduct in his case. *See id.* at n.18. Indeed, the only evidence he provides is Ney's inability to remember his case at all. This is not evidence of discriminatory intent.

### 2. Culpability Phase

Smith contends that during the guilt phase, the prosecutor introduced victim-impact evidence, engaged in improper argument, failed to disclose favorable impeachment evidence, and failed to disclose that a police officer saw a blue car with the back window missing.

#### a. Victim-Impact and Improper Argument

During his opening statement, the prosecutor introduced testimony regarding the size of the victim's family. The victim's daughter also testified to the extent of the victim's remaining family members. We refuse to hold that these two comments, made to a three-judge panel, so infected the trial as to render it fundamentally unfair.

Smith further objects to the prosecutor's comment describing the crime as "cold and calculating," his statement that Smith robbed the victim while blood spurted out her neck, and his statement that Smith got up the next morning and celebrated. We believe that these statements are reasonable inferences drawn from the evidence presented at trial. *See Byrd v. Collins*, 209 F.3d 486, 536 (6th Cir. 2000). In any event, these statements, like the preceding ones, were not so egregious as to render the trial fundamentally unfair. *See id.*

### b. Brady Claim

Smith contends that the prosecutor failed to disclose favorable impeachment evidence as required by *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, Smith claims that the prosecutor failed to reveal that Brenda Henson, who tended bar at the Race Inn, testified that she knew Smith as a customer at the bar. Smith also claims that the prosecutor failed to disclose an eyewitness Jane Echols, who had been with Mary Bradford at the bar. Echols purportedly could not identify Smith as the man who left the bar with the victim. Smith also asserts that the prosecutor failed to disclose that a police officer saw a blue car with the back window missing, which was not Smith's car, outside the victim's residence.

Materiality is an essential element of a *Brady* claim. *Brady*, 373 U.S. at 87. We agree with the district court that:

> Without deciding whether the State actually withheld the evidence, this Court finds that the witness statements alleged to have been withheld by the State are neither exculpatory nor material. . . . First, with respect to the identification of Petitioner by Ms. Henson, the fact that she identified Petitioner as a patron of the bar, as well as a possible perfume salesman are neither contradictory to her testimony, nor material. There were no inconsistencies in the identification of Petitioner and no showing has been made by Petitioner that the standards for materiality have been met. Second, the testimony of Janice Echols was not material, as she could neither include nor exclude Petitioner as the person who left the bar with the victim. In sum, the allegedly withheld "exculpatory" evidence is simply not compelling.

*Smith v. Anderson*, 104 F. Supp.2d at 824-25. This claim is without merit.[11]

### 3. Mitigation Phase

Smith objects to the prosecutor's statements during mitigation that Smith lacked remorse and that he could not meet the insanity standard and therefore no mitigating factors were present. Finally, Smith complains that the prosecutor urged the sentencer to consider non-statutory aggravating circumstances. Again, these statements were made to a three-judge panel, who are presumed to base their judgment on relevant evidence. This argument lacks serious merit.

### 4. Cumulative Effect

Smith claims that the cumulative effect of prosecutorial misconduct rendered his trial fundamentally unfair. Because we find no prosecutorial misconduct as to any of the individual claims, there can be no cumulative effect of prosecutorial misconduct.

### H. Jury Waiver

Smith waived his right to a jury trial, subsequently withdrew the waiver, entered another waiver of a jury trial, and finally requested to be tried by a three-judge panel instead. Smith argues that the district court erred in determining that his jury waiver was proper. His claim is three-faceted. First, he claims that his waiver is not valid because his attorney and the court represented that he could not withdraw the waiver. Second, Smith contends that the court did not adequately inform him of the consequences. Third, Smith asserts that his attorneys did not adequately research potential consequences of waiver.

---

[11]Although the district court did not discuss the car, Smith offers no argument as to why this evidence is material.

As the district court held, this claim is utterly without merit. The district court thoroughly and exhaustively addressed the issue, and we incorporate by reference its holding at pages 795-96. *See Smith*, 104 F. Supp.2d at 795-96. *See also Lott v. Coyle*, 261 F.3d 594,613-15 (6th Cir. 2001) (holding that the petitioner's waiver of right to jury trial was knowing, intelligent and voluntary although the trial court conducted no independent inquiry into the extent of the alleged discussions between the petitioner and his counsel; finding no error on facts of case).

## I. Constitutionality of Ohio's Death Penalty

Smith attacks the constitutionality of Ohio's death penalty on various grounds. First, he alleges that the Ohio scheme is unconstitutional because "there is no legitimate, compelling state interest in killing a person." This global attack on the death penalty as a violation of the Eighth Amendment is foreclosed by *Gregg v. Georgia*, 428 U.S. 153, 168-87 (1976).

Next, Smith claims that Ohio's sentencing procedures are unreliable. He contends that the Ohio scheme gives the jury too much discretion in determining the aggravating circumstances. Specifically, he claims that the statute fails to require the state to prove the absence of mitigating factors, as opposed to requiring the defendant to prove the existence of mitigating circumstances by a preponderance of the evidence, and fails to define relevant terms such as "weighing" and "mitigating." The Constitution contains no such requirements. *See Buchanan v. Angelone*, 522 U.S. 269, 275-76 (1998) (holding that the Eighth Amendment does not require the jury be instructed on the concept of mitigating evidence or on particular statutory mitigating factors, and that states are free to structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to it). Furthermore, this Court has upheld Ohio's statutory scheme for weighing aggravating circumstances

against mitigating factors. *See Buell v. Mitchell*, 274 F.3d 337, 367-68 (6th Cir. 2001).

Smith argues that the Ohio death penalty statutes are unconstitutional "because they require proof of aggravating circumstances in the trial phase of a bifurcated proceeding." We rejected this argument in *Coleman,* 268 F.3d at 443 (holding that the Ohio scheme, by requiring proof of aggravating circumstances at the guilt, rather than penalty phase, is consistent with *Lowenfield v. Phelps*, 484 U.S. 231 (1988)). *See Lowenfield,* 484 U.S. at 241-46; *Buell*, 274 F.3d at 269-70. Smith's next argument is that the Ohio statute is unconstitutional because it permits duplication between the aggravating circumstances and an element of the underlying crime. This argument is also inconsistent with *Lowenfield* and has been rejected by this Court in *Buell*. *See Lowenfield*, 484 U.S. at 246; *Buell*, 274 F.3d at 269-70.

Smith contends that the Ohio statute fails to provide for an adequate proportionality review by the appellate courts. However, comparative proportionality review is not constitutionally required, *see Pulley v. Harris*, 465 U.S. 37, 50 (1984), and this argument has already been rejected by this Court. *Buell*, 274 F.3d at 368-69; *Byrd*, 209 F.3d at 539; *Coe v. Bell*, 161 F.3d 320, 351-52 (6th Cir. 1998). Smith also alleges that the electric chair violates the Eighth Amendment. We rejected this argument too in *Buell*. *See Buell*, 274 F.3d at 370.

Finally, as a general matter, this Court has upheld the constitutionality of the Ohio death penalty scheme. *See Buell*, 274 F.3d at 367-70; *Byrd*, 209 F.3d at 539.

## J. Grand Jury Discrimination

Smith alleged that his constitutional rights were violated because African-Americans were under represented in the pool from which his grand jury was selected. The district court held that this claim was procedurally defaulted, because

Smith failed to present this claim in any state court proceeding. The district court ruled in that alternative that Smith had failed to substantiate his claim under the test set forth in *Jefferson v. Morgan*, 962 F.2d 1185 (6th Cir. 1992). *See Smith,* 104 F. Supp.2d at 849.

Smith did allege in a motion to alter or amend judgment that the grand jury foreman in his case was selected in a discriminatory fashion. In support, he offered the results of a statistical study, which he claimed demonstrated racial discrimination in the selection of grand jury forepersons in Hamilton County. He also alleged that he had actually raised his twenty-fourth ground in his State post-conviction petition as his thirtieth claim. The district court rejected Smith's new allegation, holding that it was never presented in state court, and was procedurally defaulted. The court also rejected the claim on the merits. We agree with the district court that this claim is procedurally defaulted under Ohio's doctrine of *res judicata* as stated by the court at 104 F. Supp.2d at 849-50, and its amended order denying Smith's motion to alter or amend judgment, dated July 27, 2000. Furthermore, we will not overlook the default here, because as the district court held, the State has never been afforded an opportunity to rebut the claim and belated proof.

### IV. Conclusion

Having completed our responsibility "to ensure that Petitioner's conviction and death sentence comport with the requirements of our Constitution," *Byrd*, 209 F.3d at 540, we hereby **AFFIRM** the judgment of the district court denying the petition for writ of habeas corpus.

### CONCURRING IN PART, DISSENTING IN PART

R. GUY COLE, JR., Circuit Judge, concurring in part and dissenting in part. I concur only in the result reached by the majority denying each of the asserted grounds for habeas relief, with the exception of Smith's claim that the trial court's refusal to provide him with a defense psychiatric expert, as opposed to a neutral psychiatric expert, violated *Ake v. Oklahoma*, 470 U.S. 68 (1985). Because I believe that the trial court failed to provide Smith with a mental health expert for the defense as required by *Ake*, and as interpreted by this Court in *Powell v. Collins*, 328 F.3d 268 (6th Cir. 2003), I respectfully dissent on this issue.

I believe that there are three critical considerations in assessing Smith's argument that he should be granted a writ of habeas corpus because the state trial court violated *Ake*, by failing to provide him with a psychiatrist to function as a defense expert. First, we must assess whether Smith was entitled to expert psychiatric assistance under *Ake*, given that he withdrew his insanity plea prior to trial. Second, if *Ake* guarantees Smith expert psychiatric assistance, we must consider whether his right to psychiatric assistance is satisfied by the appointment of a neutral "friend-of-the-court" psychiatrist. Third, if the neutral psychiatrist does not satisfy *Ake*'s command, we must determine whether the failure to provide Smith with a defense expert psychiatrist was harmless error.

### I.

In *Ake*, the Supreme Court held that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a state provide access to a psychiatrist's assistance on this issue, if the defendant cannot

otherwise afford one." 470 U.S. at 74. The Court went on to state that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Id.* at 83.

Prior to our opinion in *Powell*, we noted that *Ake* requires that a defendant be provided with psychiatric assistance during the sentencing phase if the defendant's sanity is a significant factor at trial, or if the state presents psychiatric evidence of future dangerousness. *Mason v. Mitchell*, 320 F.3d 604, 615-16 (6th Cir. 2003); *Skaggs v. Parker*, 235 F.3d 261, 272 (6th Cir. 2000); *United States v. Osaba*, 213 F.3d 913, 917 (6th Cir. 2000). We had also recognized, however, the possibility that *Ake* suggests that a defendant is entitled to a competent defense expert. *Skaggs*, 235 F.3d at 272-73.

We must first address whether *Ake*'s protections apply to Smith, given that he withdrew his insanity plea prior to trial. I believe that *Ake* still applies. A number of Circuits, including our own, have interpreted *Ake* to require expert assistance beyond psychiatric assistance in conjunction with an insanity plea. In *Terry v. Rees*, 985 F.2d 283 (6th Cir. 1993), this Court noted that *Ake* stands for the proposition that criminal trials are fundamentally unfair "if a state proceeds against an indigent defendant without making certain that he has access to the raw materials integral to building a defense." *Terry*, 985 F.2d at 284. Accordingly, we held that the trial court violated *Ake* in denying the defendant's request for an independent pathologist in order to challenge the government's position as to the victim's cause of death. *Id.* Similarly, the Eighth Circuit has held that the rule of *Ake* applies when the expert in question is not a psychiatrist, finding "no principled way to distinguish between psychiatric and nonpsychiatric experts." *Little v. Armontrout*, 835 F.2d 1240, 1243 (8th Cir. 1987) (en banc). The Eighth Circuit has also held that *Ake* required the

appointment of a psychiatrist when the defendant had not pleaded insanity, but where his mental retardation was his strongest argument in mitigation for sentencing purposes. *Starr v. Lockhart*, 23 F.3d 1280, 1288 (8th Cir. 1994).

Many courts have interpreted *Ake*'s command – to provide expert psychiatric assistance when a defendant's sanity is a significant factor – to mean more than strictly whether or not the defendant has pleaded not guilty by reason of insanity. Rather, *Ake* has regularly been interpreted to require expert psychiatric assistance any time the defendant's "mental condition" is shown to be a significant factor at trial. In other words, the Supreme Court's use of the term "sanity" in *Ake* was not restricted to occasions when defendants have chosen to plead insanity, but rather, encompassed all significant issues concerning a defendant's mental condition. Indeed, in *Ake* itself, the Supreme Court stated that, "when the State has made the defendant's *mental condition* relevant to his criminal culpability and to the punishment he might suffer, the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense." 470 U.S. at 80 (emphasis added). Many other courts have recognized this reading of *Ake* as well. *See Pizzuto v. Arave*, 280 F.3d 949, 963 (9th Cir. 2002) (noting that in *Ake*, the Supreme Court recognized an indigent defendant's right to an independent expert when the state makes mental condition relevant); *Walker v. Attorney Gen. of Okla.*, 167 F.3d 1339, 1348 (10th Cir. 1999) (stating that the *Ake* inquiry is whether evidence is presented to the trial court suggesting that the defendant's mental condition is likely to be a significant factor); *Chaney v. Stewart*, 156 F.3d 921, 925 (9th Cir. 1999) ("*Ake* held that a state must provide indigent criminal defendants with expert psychiatric assistance if the defendant's mental condition is a significant factor at trial."); *United States v. Roman*, 121 F.3d 136, 144 (3d Cir. 1997) ("In *Ake*, the Supreme Court held that, when a capital defendant demonstrates that his mental condition is a significant factor at his sentencing phase, he is 'entitled to the assistance of a psychiatrist.'").

Thus, it was apparent, even before our decision in *Powell*, that *Ake*'s protection extended beyond expert psychiatric assistance for insanity pleas. However, if any doubt existed prior to *Powell*, such confusion has now been addressed.[1] As the majority notes, our decision in *Powell* gives no indication that the petitioner's sanity was actually at issue during the trial. Rather, it appears that the petitioner only raised issues concerning his competence to stand trial and his "mental condition." Nevertheless, we held that the failure to provide the petitioner with a psychiatric expert to aid in his defense was a violation of *Ake*. *Powell*, 328 F.3d at 283-84. Accordingly, it is clear that Smith did not remove himself from the scope of *Ake*'s protections by withdrawing his insanity plea. Because Smith's mental condition was indeed a significant factor in the state court proceedings, he was entitled to expert psychiatric assistance.

## II.

Because I believe that Smith's mental condition entitled him to expert psychiatric assistance under *Ake*, the next question is whether Smith's right to psychiatric assistance was satisfied by the appointment of a neutral psychiatrist. Prior to *Powell*, a number of our sister circuits had held that court appointment of a neutral psychiatrist does not satisfy *Ake*. *See Starr*, 23 F.3d at 1289-91; *Smith v. McCormick*, 914 F.2d 1153, 1157 (9th Cir. 1990) (holding that the right to psychiatric assistance recognized by *Ake* "does not mean the right to place the report of a 'neutral' psychiatrist before the court; rather it means the right to use the services of a psychiatrist in whatever capacity defense counsel deems appropriate"); *United States v. Sloan*, 776 F.2d 926, 929 (10th Cir. 1985) ("The essential benefit of having an expert in the

---

[1] It is noteworthy that the district court's thorough and articulate opinion in this case was issued before this Court issued its decision in *Powell*. Thus, the district court did not have the benefit of considering the precedential value of *Powell* when ruling on Smith's petition.

first place is denied the defendant when the services of the doctor must be shared with the prosecution.") In *Powell*, we explicitly adopted this position. 328 F.3d at 284. Thus, because Smith was only provided with a court-appointed neutral expert, *Powell* requires that we find the state court to have violated *Ake* in the present case as well.

I am not persuaded by the argument that we may ignore *Powell* because its holding is contrary to *Ake* and Sixth Circuit precedent. *Ake* did, indeed, state that an indigent defendant does not possess a constitutional right to "choose a psychiatrist of his personal liking." 470 U.S. at 83. However, I do not read this passage from *Ake* to imply that a defendant is not entitled to a "defense expert," as opposed to a neutral expert. This passage from *Ake*, I believe, is properly read to state that, of the experts available to testify as a defense expert, a defendant is not free to choose the expert "of his personal liking," just as an indigent defendant is not entitled to the services of the defense attorney of his choice. In fact, the *Ake* Court itself stated that the right to psychiatric assistance must assure the defendant "access to a competent psychiatrist who will . . . assist in evaluation, preparation, and presentation of the defense." *Id.* I do not believe that the role of a court-appointed neutral psychiatrist properly meets this criterion. While *Ake* does not require that a defendant have access to the psychiatrist of his choice, it does require access to a psychiatrist who will assist in the defense. A court-appointed neutral expert is not a defense expert.

Thus, I believe that the holding of *Powell* is not in conflict with *Ake*, nor is it in conflict with any of the cases in our circuit that cite *Ake* for the proposition that a defendant is not entitled to the assistance of the psychiatrist of his choice. Because I would find that the denial of a defense psychiatric expert violated Smith's rights under *Ake* and *Powell*, I now turn to the question of whether this was harmless error.

### III.

In *Powell*, we found that the trial court's denial of an *Ake* expert was not harmless error because "Dr. Schmidtgoessling was not equipped to conduct the appropriate examination required for her to set forth all of the facts or information the jury should have considered at mitigation." 328 F.3d at 287. Similarly, in the present case, Dr. Schmidtgoessling acknowledged that she functioned in the case as a friend of the court, rather than as an advocate for Smith. She testified that, as a member of the defense side, in mitigation, her role would be to look for factors to try to explain Smith's behavior and save his life. In contrast, however, as a friend of the court, her role was simply "to perform psychological or psychiatric evaluations that the attorneys would then decide how does that fit into their defense strategy. We don't start out looking for things that are mitigating . . . ." The majority opinion correctly notes that Dr. Schmidtgoessling's testimony was presented at mitigation; it, however, fails to take note of the legal consequence of Dr. Schmidtgloessing's appearance as a neutral expert, rather than a defense expert. See *ante*, at n.9   From her own admission it is clear that Dr. Schmidtgloessing saw her role as a "friend of the court." This, I contend, fails to meet the requirement established in *Ake*.

We found in *Powell* that the testimony of a defense expert may have provided facts and information to consider at mitigation that may have led to a different sentence for the defendant. *Id.* The facts of this case lead me to the same conclusion.   Smith endured an exceedingly difficult childhood. He spent time living with abusive foster parents, was diagnosed with diffuse cerebral dysfunction, and spent time in a juvenile psychiatric facility where, among other things, he received electric shock therapy. Given this history, the lack of expert assistance to which Smith was entitled under *Ake* "had such a substantial and injurious effect or influence in determining" the sentencing decision, *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), that I have "grave

doubt" about the harmlessness of the error, *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995). The defense appropriately concluded that Smith's best argument at mitigation would be to focus on his mental condition. However, without the aid of an expert to testify on Smith's behalf, the defense was unable to properly put this argument before the sentencing court. Accordingly, I would grant Smith's request for a writ of habeas corpus based on the state's failure to provide him with a defense psychiatric expert in mitigation.